147 F.3d 839
 13 IER Cases 1845, 98 Cal. Daily Op. Serv. 4158,
98 Daily Journal D.A.R. 5755
 Nickie Larelle MORAN, Plaintiff-Appellee,
v.
STATE OF WASHINGTON; Deborah Senn, Individually and in Her
Capacity as State Insurance Commissioner; and
Krishna Fells, Individually and in Her
Capacity as Chief of Staff,
Defendants-Appellants.
 No. 96-36129.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1997.
Decided June 2, 1998.
 
 Michael P. Lynch, Office of Atty. Gen., Tort Claims Division, Olympia, WA, for appellants.
 Paul Lindenmuth, Law Offices of Neil J. Hoff, Tacoma, WA, for appellee.
 Appeal from the United States District Court for the Western District of Washington Franklin D. Burgess, District Judge, Presiding. D.C. No. 96-5050-FDB.
 Before: FLETCHER and O'SCANNLAIN, Circuit Judges, and SCHWARZER, District Judge.*
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide, on appeal from denial of summary judgment, whether a state agency head may discharge a subordinate who refuses to carry out official agency policy without subjecting herself to the risk of personal liability for breach of constitutional rights.
 
 
 2
 * Deborah Senn was elected to the office of Washington State Insurance Commissioner in November 1992. During her campaign, Senn had advocated the expansion of consumer "outreach" and education programs conducted by the Office of the Insurance Commissioner ("OIC"). To that end, in August 1993, she hired Nickie Moran as Deputy Commissioner for Consumer Advocacy and Outreach.[1]
 
 
 3
 In her capacity as Deputy Commissioner, Moran supervised a staff of more than twenty individuals in two cities, Seattle and Olympia, and reported directly to Krishna Fells, Senn's Chief of Staff.[2] As one of her primary duties, Moran was responsible for developing and implementing an "outreach" program for the OIC aimed, according to Senn, at informing and educating Washington citizens regarding insurance matters. The outreach effort envisioned by Senn involved, inter alia, the following activities: setting up informational tables in city halls around Washington; canvassing malls and attending fairs throughout the State and distributing brochures regarding the OIC; participating in local parades; speaking at community groups and organizations about insurance-related issues; sending OIC staff to the sites of natural disasters such as floods, earthquakes, and fires; and obtaining broadcast time on local radio stations to discuss OIC programs. Consumer outreach was, in Moran's own words, a "central theme" of Senn's vision for the OIC--an item "at the top of Senn's agenda."
 
 
 4
 Senn contends that, despite her position as Deputy Commissioner for Consumer Advocacy and Outreach, Moran insubordinately opposed the development and implementation of the outreach plan. Indeed, Moran's own complaint and declaration frankly confess her opposition to the outreach program, at least as conceived by Senn. Moran believed that the outreach program constituted "unlawful political activity" intended for "Senn's political gain," and, for that reason, she "continually resisted and refused to engage" in outreach activity. She also feared that the proposed expansion of outreach activity would unnecessarily drain Consumer Advocacy and Outreach Division resources, and thus detract from what she viewed as her office's primary responsibility, the servicing of individual consumer complaints. Moran therefore "settled on a strategy of continuing to try to persuade [Senn] that [expanded outreach] would negatively impact productivity." She "reminded and emphasized to" Senn that she believed that the proposed outreach program would be counterproductive. Moran candidly questioned "the logic" of the plan, and cautioned Senn that the proposed shift in focus would "use awfully expensive staff to hand out materials." Despite her knowledge of Senn's "plans to move forward with outreach activities," Moran "continued to object" to the proposal to reallocate 20% of OIC compliance officers' time to outreach activities, and openly discussed her concerns over "productivity and ethical issues" surrounding the outreach program with her co-workers, most of whom adamantly opposed the expansion of outreach activity.
 
 
 5
 On March 3, 1995, Senn dismissed Moran effective March 17, 1995. She cited a "clear difference in management philosophy" as the reason for Moran's termination.
 
 
 6
 Moran filed suit in the United States District Court for the Western District of Washington, claiming that Senn had violated her right to free speech protected by the First and Fourteenth Amendments, and that both Senn and the State of Washington were liable under state law for wrongful termination, either intentional or negligent infliction of emotional distress, and the tort of outrage. On May 20, 1996, the district court dismissed all of Moran's state law claims. In its order, the court also ruled that the outreach program did not, contrary to Moran's initial accusations, constitute illegal campaign activity under Washington state law:
 
 
 7
 During Plaintiff's employment, the Commissioner had not announced her future candidacy for any office, and there are no allegations that Defendants solicited votes or money. Moreover, the Commissioner is under a duty to educate the public about insurance issues. RCW 48.02.160 requires that the Insurance Commissioner disseminate information concerning the insurance laws of the state and provide assistance to the public in obtaining information about insurance products and in resolving complaints involving insurers and other licensees.
 
 
 8
 Order Granting Motion to Dismiss State Law Claims at 3, Moran v. State of Washington, No. C96-5050-FDB (W.D.Wash. May 20, 1996).[3]
 
 
 9
 Senn then moved for summary judgment both on the merits of Moran's First Amendment claim and on the basis of qualified immunity. The district court deemed it "inappropriate" to consider the merits in light of the discovery stay that it had imposed pending the resolution of the qualified immunity issue. The court did, however, address what it termed the "purely legal" issue of qualified immunity. On that score, the district court held:
 
 
 10
 Plaintiff Moran spoke about issues of public importance with Defendants Senn and Fells and such speech may not furnish the basis for her dismissal. Dismissal based upon protected speech is impermissible. The contours of that right are sufficiently clear that a reasonable official would understand that termination for exercise of that right would be unlawful.
 
 
 11
 In concluding that Moran possessed a "clearly established" right to speak, a violation of which would give rise to personal liability, the district court, in accordance with the Supreme Court's decision in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), stated that it would balance Moran's right to criticize OIC initiatives against the State's interest in office efficiency. It acknowledged Senn's contention that Moran's "insubordinate refusal to carry out [her] instructions was disruptive to the expansion of outreach activity." The court, however, explicitly refused to consider Senn's argument, concluding that "[i]t would be illogical to hold Plaintiff's failure to implement the Defendants' proposed outreach plan as disruptive because the proposed program was the very subject of Plaintiff's protected speech." The district court thus rejected Senn's claim of qualified immunity and denied her motion for summary judgment.
 
 
 12
 This appeal ensued. Senn argues that the district court erred in refusing to consider in its Pickering balancing Moran's disruption of the implementation of the outreach program. Correctly applied, she contends, "the outcome of the Pickering test is either in the State's favor, or so uncertain as not to be clearly established and therefore the defendants are entitled to qualified immunity as a matter of law."
 
 II
 
 13
 In Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court established that a district court's denial of summary judgment on a claim of qualified immunity is subject to immediate appeal under 28 U.S.C. § 1291 pursuant to the so-called "collateral order" doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The scope of appellate jurisdiction in such a case, however, is limited. In Mitchell, the Supreme Court held that a public-official defendant may appeal the "purely legal" issue "whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of clearly established law." Id. at 528 n. 9. A defendant may not, however, "appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, 515 U.S. 304, 319-20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). In other words, "we have jurisdiction to review the district court's decision that defendants' alleged conduct violated clearly established law, but the collateral order doctrine does not provide appellate jurisdiction to review the district court's decision that material issues of fact exist for trial." Armendariz v. Penman, 75 F.3d 1311, 1317 (9th Cir.1996) (en banc).
 
 
 14
 Moran argues that, under Johnson, we are without jurisdiction over Senn's appeal, because the district court concluded in its decision that genuine issues of material fact exist, and because this court may not pass upon "the factual question of whether or not the district court made the appropriate determination on summary judgment as to the existence of disputes (sic) issues of fact for trial." Moran appears, however, to have misapprehended the nature of Senn's challenge. Senn does not dispute the district court's conclusion that genuine issues of fact exist. She is not before this court claiming, as were the defendants in Johnson, that there is insufficient evidence in the record to provide Moran with a cause of action against her. Rather, as both her original summary judgment motion and her appellate briefs make perfectly clear, she is merely arguing that the district court misapplied the Pickering balancing test as a matter of law. She contends that, under the proper application of that standard, any "right" that Moran might have possessed to speak out against OIC policy was, at the time of her dismissal, insufficiently "clearly established" to preclude qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and its progeny. Senn, in sum, is "not asking this Court to re-decide the facts, but rather, to reapply the law."
 
 
 15
 This court recently made clear that "a denial of summary judgment on qualified immunity grounds is not always unappealable simply because a district judge has stated that there are material issues of fact." Collins v. Jordan, 110 F.3d 1363, 1370 (9th Cir.1996) (as amended); accord P.B. v. Koch, 96 F.3d 1298, 1301 (9th Cir.1996) ("That the parties dispute some of the facts does not render the denial of qualified immunity nonappealable."). Rather, as the Supreme Court explained in Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), the Johnson bar to appellate jurisdiction is more nuanced and more limited:
 
 
 16
 Denial of summary judgment often includes a determination that there are controverted issues of material fact, and Johnson surely does not mean that every such denial of summary judgment is nonappealable. Johnson held, simply, that determinations of evidentiary sufficiency at summary judgment are not immediately appealable.
 
 
 17
 Id. at 842 (citations omitted). Because Senn is not contesting a "determination[ ] of evidentiary sufficiency," but, rather, is appealing the "purely legal" issue whether or not Moran's claimed "right" to speak was clearly established at the time of her termination, we conclude, contrary to Moran's protestations, that we do indeed possess appellate jurisdiction over Senn's appeal pursuant to 28 U.S.C. § 1291.
 
 III
 
 18
 Our task in deciding this appeal is straightforward: We simply assume the relevant facts in the light most favorable to Moran, and then determine whether Senn is nonetheless entitled to qualified immunity as a matter of law. See Johnson, 515 U.S. at 319, 115 S.Ct. 2151; Armendariz, 75 F.3d at 1317. We review de novo the district court's denial of summary judgment based upon a claim of qualified immunity. See Thompson v. Souza, 111 F.3d 694, 698 (9th Cir.1997).
 
 
 19
 * Pursuant to the now familiar standard of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), public officers acting in their official capacities are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. 2727. Under Supreme Court precedent as it has evolved since the watershed Harlow decision, the qualified immunity "defense" has been defined quite broadly: "[I]t provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... [I]f officers of reasonable competence could disagree on th[e] issue [whether or not a specific action was constitutional], immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); see also Knox v. Southwest Airlines, 124 F.3d 1103, 1107 (9th Cir.1997) ("Th[e] test allows ample room for reasonable error on the part of the [government official]."); Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991) ("[R]egardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful."). Moreover, the plaintiff bears the burden of proving that the rights she claims were "clearly established" at the time of the alleged violation. See Davis v. Scherer, 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); Collins, 110 F.3d at 1369.
 
 
 20
 To be considered "clearly established" for the purposes of qualified immunity analysis, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Supreme Court has recognized that the operation of the Harlow "clearly established rights" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Id. at 639, 107 S.Ct. 3034. Hence, the Supreme Court has directed that the inquiry into whether or not a claimed right was "clearly established" must focus upon the right not in a general, abstract sense, but rather in a practical, "particularized" sense. See id. at 640, 107 S.Ct. 3034. Likewise, this court has observed that "[b]road rights must be particularized before they are subjected to the clearly established test," Kelley v. Borg, 60 F.3d 664, 667 (9th Cir.1995), and has interpreted the Supreme Court's command in Anderson in the following manner: "[T]he right referenced by the Harlow test is not a general constitutional guarantee ... but its application in a particular context." Todd v. United States, 849 F.2d 365, 370 (9th Cir.1988) (emphasis added); accord Wiley v. Doory, 14 F.3d 993, 995 (4th Cir.1994) ("[T]he proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.") (quoting Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir.1992)). See generally Richard H. Fallon, The Supreme Court, 1996 Term--Foreword: Implementing the Constitution, 111 Harv. L.Rev. 54 (1997) (discussing the distinction between the ideals enshrined in the Constitution and the courts' implementation of those ideals in concrete cases).
 
 
 21
 Here, the district court concluded that "[d]ismissal based upon protected speech is impermissible. The contours of this right are sufficiently clear that a reasonable official would understand that termination for exercise of this right would be unlawful." Although the district court's observation--that dismissal based upon "protected speech" is unlawful--is correct as a matter of abstract constitutional principle, it does not account, as it should have under Anderson, for the manner in which that "right" is implemented and administered, namely by way of the balancing test first articulated in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As is explored in greater detail in part III.B, the Pickering test demands that, in determining whether a particular employee's expression is constitutionally protected at all, courts balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services that it performs through its employees." Id. at 568, 88 S.Ct. 1731.
 
 
 22
 As this court has previously recognized, the Pickering analysis "requires particularized balancing based on the unique facts presented in each case." Voigt v. Savell, 70 F.3d 1552, 1560-61 (9th Cir.1995); see also Connick v. Myers, 461 U.S. 138, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("Although [Pickering's] particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests."). Consequently, the relevant "right" at issue in this case is not the generic First Amendment right to free speech. Nor is it the right to be free from speech-based retaliatory discharge. Rather, whether or not Senn violated Moran's "clearly established" constitutional rights depends upon the sensitive ad hoc balancing that Pickering entails. See Chateaubriand v. Gaspard, 97 F.3d 1218, 1224 (9th Cir.1996). In other words, the pertinent question for our purposes in determining Senn's entitlement to qualified immunity can be reduced to this: Was it, in March 1995, so "clearly established" that Moran's interest in expressing her opinion outweighed the State's interest in avoiding disruption that the unlawfulness of dismissing Moran would have been sufficiently "apparent" to Senn, see Anderson, 483 U.S. at 640, 107 S.Ct. 3034, that she could not "have reasonably believed that [her] particular conduct was lawful," Romero, 931 F.2d at 627?
 
 B
 
 23
 Obviously, "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). In the not-too-distant past, of course, free speech rights in the government workplace were virtually nonexistent. Rather, the law accorded with Justice Holmes's oft-quoted observation that whereas a policeman "may have a constitutional right to talk politics ... he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517, 517 (1892).
 
 
 24
 More recently, however, courts have provided government employees with at least some protection against speech-related discipline and discharge. Under current Supreme Court doctrine, when a public-employee plaintiff alleges that she has been terminated in retaliation for exercising her First Amendment right to speak freely, courts undertake a three-step inquiry. The standard is well-established:
 
 
 25
 To prevail, an employee must prove (1) that the conduct at issue was constitutionally protected, and (2) that it was a substantial or motivating factor in the termination. If the employee discharges that burden, (3) the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.
 
 
 26
 Board of County Comm'rs v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996) (enumeration added); accord Mount Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In order for a public employee's expression to be "constitutionally protected" within the meaning of step one of the three-step test, two separate conditions must be satisfied. As a threshold matter, the speech must touch on a matter of "public concern." If it does not, then the First Amendment is not implicated at all, and "it is unnecessary ... to scrutinize the reasons for [an employee's] discharge." Connick, 461 U.S. at 146, 103 S.Ct. 1684. If it does, then the reviewing court must determine whether the employee's interest in expressing herself outweighs her employer's interest in preventing potential workplace disruption. In striking that balance, courts look to the so-called Pickering balancing test, named for the case in which the standard was articulated: "The question of whether speech of a government employee is constitutionally protected expression necessarily entails striking 'a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Mount Healthy, 429 U.S. at 284, 97 S.Ct. 568 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. 1731); see also Waters v. Churchill, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).
 
 
 27
 The Supreme Court has recognized that, in conducting the Pickering balance, courts must grant public employers "wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." Connick, 461 U.S at 151, 103 S.Ct. 1684 (quoting Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring)). Moreover, the State's interest in avoiding disruption is magnified when the employee asserting the right serves in a "confidential, policymaking, or public contact role." Rankin v. McPherson, 483 U.S. 378, 390-91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); see also Connick, 461 U.S. at 151-52, 103 S.Ct. 1684 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate."). The Supreme Court also recently concluded that, in executing the Pickering balance, courts should not require government employers to demonstrate that an employee's speech actually disrupted efficient office operation; rather, "reasonable predictions of disruption" are sufficient. Waters, 511 U.S. at 673, 114 S.Ct. 1878. Consequently, under Pickering, only if the employee's right to speak is not outweighed by the government's interest in avoiding potential disruption will a First Amendment right be recognized.
 
 
 28
 Senn specifically conceded in her brief that Moran's speech touches on a matter of public concern, and is therefore "covered" by the First Amendment. After conducting a Pickering analysis, the district court concluded that Senn had failed to show that the State's interest in preventing disruption outweighed Moran's interest in speaking freely.[4] The district court never reached the issues whether Moran's speech was a "substantial or motivating factor" for her dismissal or whether Senn would have relieved Moran of her duties irrespective of her speech. As a result, our attention in this appeal must focus on the Pickering balancing analysis, to which we now turn.
 
 IV
 
 29
 Because the underlying determination pursuant to Pickering whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently "clearly established" to preclude qualified immunity under Harlow and its progeny. We are certainly not the first to recognize this self-evident tenet of qualified immunity jurisprudence. Indeed, this court has itself acknowledged, in a slightly different context, the difficulty of divining clearly established legal principles from multifactor balancing tests. See Baker v. Racansky, 887 F.2d 183, 187 (9th Cir.1989) (upholding a claim of qualified immunity for social workers who had taken a child into protective custody after noting that the case "involve[d] the difficult balancing of a family's right to autonomy against the state's interest in protecting minor children from abuse"). And today we join the chorus of voices from other circuits that have specifically observed the difficulty of finding clearly established law under Pickering. See Kincade v. City of Blue Springs, 64 F.3d 389, 398 (8th Cir.1995); DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir.1995); O'Connor v. Steeves, 994 F.2d 905, 917 n. 11 (1st Cir.1993); Guercio v. Brody, 911 F.2d 1179, 1183-85 (6th Cir.1990); Melton v. City of Oklahoma City, 879 F.2d 706, 729 (10th Cir.1989), modified on other grounds, 928 F.2d 920 (1991) (en banc); Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir.1989); Noyola v. Texas Dep't of Human Resources, 846 F.2d 1021, 1025 (5th Cir.1988); Benson v. Allphin, 786 F.2d 268, 276 (7th Cir.1986).[5]
 
 
 30
 However, notwithstanding our recognition of the fact that Pickering will not, as a general matter, generate clearly established law, we may not--and do not--excuse ourselves from the responsibility of judging each case on its own merits. Therefore, today we undertake to determine, on the specific facts of this case, whether Moran has discharged her burden, under Davis v. Scherer, 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), of proving that the rights she claims under Pickering were, at the time of her dismissal, so "clearly established" that Senn could not "have reasonably believed that [her] particular conduct was lawful," Romero, 931 F.2d at 627.
 
 
 31
 * As an initial matter, we must determine whether the district court erred, as Senn claims, in refusing to consider in its Pickering balance any actual or potential disruption caused by Moran's failure to develop and to implement the outreach plan. In its order, the district court held that "[i]t would be illogical to hold Plaintiff's failure to implement the Defendants' proposed outreach plan as disruptive because the proposed program was the very subject of Plaintiff's protected speech."
 
 
 32
 The district court misstepped, we believe, in assuming, prior to conducting the Pickering analysis, that Moran's speech was constitutionally "protected." Although Moran's speech related to a matter of public concern--and, hence, was "covered" by the First Amendment, see Connick, 461 U.S. at 146, 103 S.Ct. 1684--no employee's speech is "protected" under the First Amendment until a court has performed the Pickering balance and concluded that the employee's interest in speaking outweighs the employer's interest in promoting efficiency and preventing disruption. See, e.g., Mount Healthy, 429 U.S. at 284, 97 S.Ct. 568. See generally Frederick Schauer, Public Figures, 25 Wm. & Mary L.Rev. 905, 932 n. 113 (1984) ("That which is covered [by the First Amendment] is not necessarily protected, but coverage ensures that a court will test the reasons for restriction against first amendment standards.").
 
 
 33
 The court also erred in refusing to consider in its Pickering balance the disruption of the outreach plan merely because it was caused by Moran's failure to implement a program that she verbally criticized. Of course, we understand that a court reasoning from the (in this case, erroneous) premise that certain speech is constitutionally protected might resist the idea of the speech being simply "balanced" against competing concerns of the State. In the typical First Amendment case--that is, when the government is acting as sovereign and not as employer--once an individual's expression triggers constitutional scrutiny, her First Amendment right to speak may not be outweighed by the government's interest in efficiency. See, e.g., Waters, 511 U.S. at 675, 114 S.Ct. 1878. The Supreme Court has made amply clear, however, that public-employee-speech cases simply are not "typical" First Amendment fare. Rather, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Id.; accord Pickering, 391 U.S. at 568, 88 S.Ct. 1731 ("[T]he state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). The practical consequence of the government's enhanced interest in efficiency is embodied in the Pickering balancing test and in the fact that, under that test, no expression is deemed "constitutionally protected" until its value has been determined to outweigh the relevant government interests.
 
 
 34
 Contrary to the district court's assumption, the very point of the Pickering balancing test is to weigh the value of the speech that causes the disruption against the harm of the disruption that is caused, either directly or indirectly, by the speech. See, e.g., Rankin, 483 U.S. at 388-89, 107 S.Ct. 2891 (weighing an employee's interest in making a disparaging remark about President Reagan against the interference, disturbance, and interruption that the disparaging remark itself might have caused); Connick, 461 U.S. at 151-52, 103 S.Ct. 1684 (weighing an employee's interest in circulating a questionnaire against the potential interference with working relationships that the questionnaire itself caused); Pickering, 391 U.S. at 572-73, 88 S.Ct. 1731 (weighing a teacher's interest in sending a letter to a newspaper that criticized the school board against the possibility that the letter itself impeded the teacher's own performance or interfered with the regular operation of the schools). Because, when the government acts as employer, it has a heightened interest in efficiency, an employee's prerogative to speak is "protected" only if the value of the speech outweighs the costs imposed by the speech.
 
 
 35
 There is, frankly, no support for the district court's refusal to consider the disruption caused by Moran's failure to implement the outreach plan solely because the plan was the subject of her speech.[6] Under the district court's version of the Pickering analysis, no meaningful balancing would ever be possible. As Senn points out in her brief, "public employees could simply protest their employer's instructions and then refuse to follow those instructions, knowing that their employer was constitutionally prohibited from any effective recourse." Consequently, we conclude that the district court did indeed err in refusing to consider in its Pickering analysis the disruption caused by Moran's refusal to develop and implement the proposed outreach program.
 
 B
 
 36
 At long last, we reach the issue that lies at the heart of this appeal: whether, under a properly calibrated application of the Pickering balancing test, the "right" claimed by Moran was, in March 1995, sufficiently "clearly established" to defeat Senn's assertion of qualified immunity. On Moran's side of the balance, Senn candidly concedes, is her interest in speaking out on an issue of public concern. This court has recognized that "inefficiency in managing and operating government entities [is a] matter[ ] of inherent public concern." Johnson v. Multnomah County, 48 F.3d 420, 425 (9th Cir.1995). Moreover, an employee's expression regarding "illegal campaign activity"--at least when her expression is truthful--falls within the category of "content inherently of public concern." Chateaubriand, 97 F.3d at 1223.
 
 
 37
 Weighed against Moran's interest in criticizing the outreach program are (1) the fact that her allegations of illegal campaign activity, as the district court specifically found, were untrue, (2) the fact that Moran served in a high-level, policymaking capacity within the OIC, and (3) the State's interest in preventing disruption spawned by Moran's opposition to the expansion of outreach activity.
 
 
 38
 In its May 20, 1996 order dismissing Moran's state law claims, the district court explicitly concluded that Senn's outreach program did not violate state campaign laws, as Moran had alleged. See supra pages 5321-22 & n. 2. In Multnomah County, we held that "the falseness of the statements should be considered ... as part of the Pickering balancing test." Multnomah County, 48 F.3d at 424. Consequently, although her untrue speech may not be per se unprotected, see id., the district court's finding of falsity certainly undermines Moran's First Amendment interest for balancing purposes.
 
 
 39
 The fact that Moran occupied the post of Deputy Commissioner, a policymaking position, also weighs in favor of Commissioner Senn. "High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims." Hall v. Ford, 856 F.2d 255, 263 (D.C.Cir.1988) (cited in Weisbuch v. County of Los Angeles, 119 F.3d 778, 784 (9th Cir.1997)). To that end, the Supreme Court has expressly held that "when close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," Connick, 461 U.S. at 151-52, 103 S.Ct. 1684, and has suggested that the State's interest in avoiding disruption is enhanced when the employee asserting her right to speak serves in a "confidential, policymaking, or public contact role," Rankin, 483 U.S. at 390-91, 107 S.Ct. 2891. In light of the facts that Moran was hired by Commissioner Senn to be one of her deputy commissioners and that Moran was specifically charged with responsibility for developing and implementing the OIC's outreach program, it seems to us scarcely debatable that Senn depended upon Moran for the "kind of close working relationship[ ] for which it can be persuasively claimed that personal loyalty and confidence are necessary to their proper functioning." Pickering, 391 U.S. at 570, 88 S.Ct. 1731.
 
 
 40
 The final, and most significant, factor favoring Senn's side of the balance is the "substantial weight" that we must accord the disruptive impact of Moran's criticism as well as Senn's "reasonable predictions of disruption." Waters, 511 U.S. at 673, 114 S.Ct. 1878. Senn's declaration specifically recorded Moran's vocal opposition to her directives and Moran's repeated failures and refusals to carry out her instructions and to implement the programs which Senn had established for the agency she headed. Moran's dissentience, according to Senn, caused her to lose confidence in her deputy commissioner's loyalty and willingness to carry out Senn's policies. Moran's opposition therefore necessarily disrupted "the effective functioning of [Senn's] enterprise" of an OIC committed to consumer outreach. Rankin, 483 U.S. at 388, 107 S.Ct. 2891. As counsel for Senn put the matter at oral argument, "the disruption" of OIC policy in this case was "inherent in the disagreement in philosophy" between Senn and Moran. And, as the Supreme Court has stated, "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." Waters, 511 U.S. at 675, 114 S.Ct. 1878.
 
 
 41
 Whether or not an employee's speech was "protected" by the First Amendment at all depends, as we have said, upon "particularized balancing based on the unique facts presented in each case." Voigt, 70 F.3d at 1560-61. Sometimes, on the merits, the question may be a close one. Not so today. We believe that on these facts, the Pickering balance tips demonstrably in favor of Commissioner Senn. Indeed, we are most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision. In this respect, we take our cue, as we must, from the Supreme Court, which recently observed that "though a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing." Waters, 511 U.S. at 672, 114 S.Ct. 1878. The same is assuredly true in this case: The law did not require that Senn, the head of a state agency, sit idly by as one of her key deputies struggled to undermine the very program that she had been charged with developing and implementing. The First Amendment simply does not constitutionalize insubordination.
 
 
 42
 Of course, we need not definitively resolve the merits at this stage. Rather, we are faced with the much simpler task of deciding whether or not the law "clearly" protected Moran's right to denounce her employers' outreach plan. It goes almost without saying that it did not. In order to defeat Senn's assertion of qualified immunity, Moran had to demonstrate that her right to speak was so "clearly established"--that is, that the Pickering balance so clearly weighed in her favor--that Senn could not have "reasonably believed" that the State's interests in promoting the efficient implementation of the outreach plan and avoiding office disruption were sufficient to justify her dismissal. See Romero, 931 F.2d at 627. Moran simply has not discharged that burden.V
 
 
 43
 Because Moran's claimed "right" to criticize the agency's proposed consumer outreach plan was not "clearly established" on the unique facts of this case, we conclude that Senn is entitled to qualified immunity and is thus shielded from liability for civil damages. Consequently, we reverse the decision of the district court and remand the case for proceedings consistent with this opinion.
 
 
 44
 REVERSED and REMANDED.
 
 
 
 *
 The Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 When Moran was initially hired, her title was Deputy Commissioner for Consumer Protection. Her office was renamed the Division of Consumer Advocacy and Outreach in late-1994
 
 
 [2]
 Both Commissioner Senn and Chief of Staff Fells have appealed the district court's denial of their claims of qualified immunity. Moran's claims against the two defendants are identical, as are their defenses to those claims. For convenience, however, we refer throughout the opinion only to Commissioner Senn. Obviously, the conclusions that we reach in the opinion are equally applicable to both Senn and Fells
 
 
 [3]
 Moran conceded in her brief that the outreach plan "may not have technically violated state campaign laws," although she maintained that it nonetheless contravened the "spirit" of those laws. We have no reason to question the district court's conclusion that Senn's outreach program did not run afoul of state law (nor is the issue before us); consequently, for the purposes of this appeal, we assume that the district court was correct in its assessment of the outreach program's legality
 
 
 [4]
 Although the court did not specifically invoke Pickering, it is clear from context that it was, in fact, performing a Pickering analysis. The court forthrightly balanced the plaintiff's and defendants' competing interests in free speech and governmental efficiency, and cited this court's opinion in Roth v. Veteran's Administration, 856 F.2d 1401 (9th Cir.1988), as authority for conducting the balancing test. Roth, in turn, invoked Pickering by name. See id. at 1407
 
 
 [5]
 As the Baker court specifically acknowledged, Roth v. Veteran's Administration, 856 F.2d 1401 (9th Cir.1988), is not to the contrary. See Baker, 887 F.2d at 187. The defendants in Roth cited Benson v. Allphin, 786 F.2d 268 (7th Cir.1986) for the proposition that "because [courts] must balance competing interests in deciding whether office disruption outweighs protected speech, and because the balancing process is fact-specific, public officials cannot be expected to predict the outcome of such balancing or engage in it themselves." Roth, 856 F.2d at 1408 (emphasis added). The Roth court noted that, in Benson, the Seventh Circuit had "recognized that allegations of constitutional violations which require courts to balance competing interests may make it difficult to find the law 'clearly established' when assessing claims of qualified immunity." Id
 In Roth, this court expressed no particular disagreement with the general tenor of the Seventh Circuit's holding. Rather, it rejected the defendants' proposed "broader reading" of Benson. Id. That is, it balked at what it perceived to be the defendants' effort to transform the Benson principle into a per se rule that Pickering can never generate clearly established law.
 We are certainly not endorsing a per se rule today; we recognize that there will be the occasional case in which existing case law is so closely on point that the law relating to a public-employee-speech claim might be said to be clearly established. Nor are we suggesting a formal evidentiary "presumption" that somehow increases a public employee's burden of showing that the law under Pickering is clearly established in her favor. We are merely observing that, as a simple matter of logic, the context-specific, fact-intensive nature of the Pickering inquiry will generally preclude the law regarding public-employee-speech claims from being sufficiently clearly established to defeat qualified immunity.
 
 
 [6]
 Moran's case falls well outside the very narrow exception that this court appears to have fashioned for cases in which public employees who "possess[ ] proof of wrongdoing" allege that their superiors are engaged in "rampant corruption." See Johnson v. Multnomah County, 48 F.3d 420, 427 (9th Cir.1995). The Multnomah County court concluded that because government employers have no "legitimate interest" in covering up wrongdoing or corruption, the disruption generated by an employee's "accurate[ ] expos[ition]" of such conduct should not be factored into the Pickering balance. See id. Obviously, in light of the district court's finding that Senn's outreach activities did not constitute unlawful campaign activity, see supra pages 5321-22 & n. 2, the Multnomah County court's limited corruption exception is simply inapposite to this case. And whereas government employers may not, under Multnomah County, have a legitimate interest in concealing corruption, they certainly do have a legitimate and considerable interest in implementing--at least within the bounds of law--the programs and policies of their choice