**Vera POOL, Plaintiff–Counter–Defendant–Appellant,**

v.

**Doug VANRHEEN; Darcy Bjork Don Dinwiddie, Defendants–Appellees,**

**Multnomah County; Dan Noelle, Defendants–counter–claimants–Appellees.**

No. 00–35997.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 2002.

Filed July 22, 2002.

Jacqueline L. Koch, Koch & Deering, Portland, OR, for the plaintiff-counter-defendant-appellant.

Jeffrey M. Batchelor, Markowitz, Herbold, Glade & Mehlhaf, Portland, OR, for the defendants-counter-claimants-appellees.

Before: LEAVY and T.G. NELSON, Circuit Judges, and RHOADES,* Senior District Judge.

* The Honorable John S. Rhoades, Sr., Senior District Judge for Southern California, sitting

RHOADES, Senior District Judge.

Vera Pool appeals the district court's grant of summary judgment in favor of the Defendants on: (1) her fourth claim for relief against all remaining Defendants [1] for retaliation against Pool's exercise of her constitutionally protected right to free speech under 42 U.S.C. § 1983; and (2) her eleventh claim for relief against Defendant Multnomah County for retaliation under Oregon Revised Statutes § 659.030A(1)(f).[2] We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## I. Background

Vera Pool, an African American woman, began working as a corrections officer for the Multnomah County Sheriff's Office ("Sheriff's Office") in 1970. Having moved up through the ranks to become a lieutenant, she ran for the position of Sheriff in 1994 and 1995 against the incumbent John Bunnell and Defendant Dan Noelle. After a poor showing in the primary, Pool dropped out of the race and supported Noelle who won the election in May 1995. Sheriff Noelle then appointed Pool to the position of Commander of the Corrections Support Division. As Commander, Pool was in charge of records, the restitution center, the matrix system, close-street supervision and the jail intervention drug program. Her direct and only supervisor was Sheriff Noelle.

Sheriff Noelle appointed another woman and three men to the other four Commander positions; however, Pool was the only racial minority. Sheriff Noelle indicated that he selected Commanders "who were respectful of diversity and who, by

their actions and their words, would establish a new tone of respect, cooperation and teamwork." Sheriff Noelle selected Pool because "she was pretty fearless in terms of getting up and out in public and talking about some needs the Sheriff's Office had, particularly in the area of civil rights, human relations and how people were treated." On June 29, 1995, Sheriff Noelle sent a letter to all Sheriff's Office staff regarding his goals for the new Commanders: "Improving agency cohesiveness. Pursuing an atmosphere of openness and good faith with employees.... Developing an expectation of *leadership by example*" (emphasis in original letter). Pool stated in her deposition that one of her duties as a Commander was to act as a liaison for the Sheriff with the African American community "to address issues and concerns, promote the sheriff on a positive note in terms of employment."

On June 19, 1997, an acquaintance asked Pool to look into the release status of his business associate, Cleveland Brigham, who was in jail on contempt charges. Pool determined that Brigham had a low "matrix" score that would normally qualify him for release in the event of overcrowding. However, unbeknownst to Pool, Brigham had been ordered by the sentencing judge to serve his full sentence, triggering his placement on the "Y" list and precluding an early release regardless of his matrix score. Without consulting the sentencing judge or the classification supervisor, Pool ordered Brigham off the "Y" list. Brigham was released that night after serving only three days of his 60 day sentence.

by designation.

1. The remaining Defendants are Sheriff Noelle and Multnomah County, as well as Sergeants Bjork and VanRheen. However, Pool has not challenged the district court's

ruling in favor of Bjork and VanRheen on appeal.

2. Or.Rev.Stat. § 659.030 was renumbered § 659A.030 in 2001.

Upon discovering that Brigham had been released, the Multnomah County District Attorney and the sentencing judge expressed concern and demanded Brigham's arrest. At Sheriff Noelle's request, the District Attorney conducted a criminal investigation into Pool's actions, finding insufficient evidence to prove that Pool had engaged in criminal activity.

Sheriff Noelle then ordered an internal affairs investigation into the circumstances surrounding the Brigham release, conducted, with Pool's approval, by Washington County Sheriff Jim Spinden, an independent investigator outside the Multnomah County Sheriff's Office. Sheriff Spinden assigned Sergeant Stephen Wilhelm to conduct the investigation. Pool was given a copy of the charges, was interviewed by Sergeant Wilhelm with her attorney present and was given the opportunity to respond to all allegations.[3]

Sergeant Wilhelm prepared a report after the investigation, dated September 11, 1997 ("Report"), finding that Pool: (1) had not been truthful in making statements that she reported Brigham's release to Sheriff Noelle before she knew about the problems surrounding the release, (2) failed to exercise due caution, (3) was delinquent in her defined duties in removing Brigham from the "Y" list without first obtaining all available information, and (4) acted improperly in using frequent flier miles earned on Multnomah County sponsored trips for personal use.

On September 29, 1997, Pool responded to the Report in writing, asserting that she had not intended to misstate information and had informed Sheriff Noelle of Brigham's release in an incidental conversation in the hall before Sheriff Noelle left on vacation. Pool also contested the finding

that she exceeded her defined duties in removing Brigham from the "Y" list and claimed she was unaware of Multnomah County's policy on frequent flier miles. However, Pool concurred with the Report's finding that she failed to exercise due caution before authorizing Brigham's release: "As to the question of whether I should have investigated further before directing the removal of Mr. Brigham from the Y List, with 20/20 hind-sight, I would agree."

In an October 20, 1997 memorandum ("Memorandum"), Sheriff Noelle reprimanded Pool on the failure to exercise due caution charge and changed the other findings from sustained to unfounded. Pool retained her Commander's title, pay rate and all other benefits. In her deposition, Pool stated that at that time she did not think this written reprimand was based on discriminatory motives.

Due to the significant media attention surrounding Brigham's incident, Sheriff Noelle released the Memorandum to the press and released the investigation records of the internal affairs unit in response to a public records request. Sergeant Bjork, the union president, had "literally hundreds of conversations" with upset corrections and law enforcement employees about the Brigham incident.

Soon after, on October 31, 1997, Sheriff Noelle designated Pool "Acting Sheriff" while he was out of town for three or four days. The following day, Pool attended a meeting organized by a group of African American and Latino activists critical of the way minorities were treated by the Portland media—in particular, *The Oregonian's* recent handling of Portland Police Chief Charles Moose and the investigation

---

3. During the investigation, Sergeants Bjork (then the union president) and VanRheen, who had been supervised by and expressed dissatisfaction with Pool in the past, reported their concerns to Sergeant Wilhelm.

of Pool. At the meeting, Pool arranged for a friend to read a Letter to the Editor ("Letter") in which Pool criticized the Sheriff's Office for its handling of the investigation and "good ole boy network." In the Letter, Pool implied that the Sheriff's Office was "very much like a septic tank, the really big chunks always rise to the top." Pool described in detail her view of the recent investigation and the discriminatory treatment she received from Sheriff's Office employees. She also discussed her removal of Brigham from the "Y" list and attempted to justify her actions. Pool commended Sheriff Noelle for his stand on diversity in the Sheriff's Office and stated her support for his philosophy on diversity.

The next day *The Oregonian* reported on the meeting and Pool's comments. A number of Sheriff's Office employees complained to Sheriff Noelle about *The Oregonian* article and Pool's statements. On November 6, 1997, Pool provided Sheriff Noelle with a copy of the Letter. Pool's presence at the meeting and the contents of the Letter concerned Sheriff Noelle for several reasons. First, Pool lent the authority of the Sheriff's Office to her statements by attending the meeting while serving as Acting Sheriff, signing the letter "Vera C. Pool, Commander, Multnomah County Sheriff's Office" and listing the Sheriff's Office address. Second, in the Letter, Pool defended her actions regarding the Brigham release and refused to accept responsibility for her actions even though she admitted she should have investigated further before ordering Brigham's removal from the "Y" list. Finally, Pool implied that the Sheriff's Office top personnel were like "really big chunks" in a "septic tank," which caused disruption in the Sheriff's Office and undermined Sheriff Noelle's authority.

On November 9, 1997, Sheriff Noelle met with Commander Hanson and the Human Resources Administrator to discuss Pool's conduct. They also discussed Pool's failure to manage the Records Unit which had a backlog of 6,000 warrants not keyed into the computer, her oral commitment of $400,000 not in the budget to a third party contractor and her failure to adequately provide systems necessary for double bunking. Consequently, Sheriff Noelle demoted Pool and decreased her pay, effective November 10, 1997, because he had "lost confidence in her judgment and her ability to be an effective Commander."

## II. Standard of Review

■■■ We review the district court's grant of summary judgment de novo. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 816, 151 L.Ed.2d 700 (2002). Our review is governed by the same standard used by the district court under Federal Rule of Civil Procedure 56(c). *Id.* Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## III. Discussion

### A. 42 U.S.C. § 1983/Speech Claim

For many years the courts followed Justice Holmes's position regarding public employees' free speech rights: " 'A policeman may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.' " *Connick v. Myers*, 461 U.S. 138, 143–44, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (quoting *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517 (1892)). This formulation began to change in the 1950s and 1960s, with the acknowledgment that " 'free and open debate is vital to informed decision-making by the electorate' " on " 'matter[s]

of legitimate public concern.'" *Id.* at 145, 103 S.Ct. 1684 (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The Supreme Court recognized that public employees do not give up their free speech rights by virtue of their employment with the government. *Id.* at 140, 103 S.Ct. 1684. ·

To prevail on a claim that a government employer punished a public employee for exercising her free speech rights, the employee must first show that her speech was constitutionally protected—that it addressed a matter of public concern. *See Connick,* 461 U.S. at 146, 103 S.Ct. 1684; *Bauer v. Sampson,* 261 F.3d 775, 784 (9th Cir.2001). Second, the employee must show that the speech in question was a "substantial or motivating factor" for the adverse employment action. *Board of County Comm'rs v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Bauer,* 261 F.3d at 784. Even if the employee meets the burden of demonstrating that the relevant speech was a matter of public concern, such speech can be subject to government restriction. *Allen v. Scribner,* 812 F.2d 426, 432 (9th Cir. 1987). Thus, if the employee meets her initial burdens, the burden shifts to the public employer to show that its "legitimate administrative interests" outweigh the employee's interest in freedom of speech. *Bauer,* 261 F.3d at 784 (citation omitted). "The inquiry into the protected status of speech is one of law, not fact." *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684.

### 1. Pool's speech addressed a matter of public concern.

As stated, a public employee must show that her speech was constitutionally protected—that it addressed a matter of public concern. *See Connick,* 461 U.S. at 146, 103 S.Ct. 1684; *Bauer,* 261 F.3d at 784. Though the United States Supreme Court has not articulated a precise definition of public concern, it has stated that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. Speech that is necessary or appropriate to enable citizens to make informed decisions about the operation of their government is of public concern, while speech by public employees addressing individual personnel disputes and grievances is not. *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983).

As an initial matter, we note that a statement's inappropriate or controversial nature is irrelevant to the question of whether it deals with a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Though Pool's "septic tank" comparison may have been inappropriate, "[d]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

The district court found that the "vast majority" of the Letter focused on Pool's view of Brigham's release, and to the extent that this was the focus, that it was properly characterized as private speech not entitled to protection. However, the district court also noted that underlying the "obvious purpose" of the Letter was Pool's concern about the racial and gender discrimination fostered by the good ole boy nature of the Sheriff's Office, which was especially relevant in an election year for Sheriff Noelle, who had promoted civil rights protection as part of his campaign.

Therefore, the district court concluded that the Letter was entitled to limited First Amendment protection.[4]

 Although it is a close call, the Letter is more aptly characterized as addressing a matter of public concern than as a personal employment grievance. Looking at the Letter's content, form and context, as revealed by the entire record, the Letter addresses a matter of public concern.

> Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies. *See Connick.* On the other hand, speech that concerns "issues about which information is needed or appropriate to enable the members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

*McKinley,* 705 F.2d at 1114 (citation omitted) (emphasis added).

 Although the Defendants allege that the Letter focused on Pool's defense of the Brigham incident, a close examination of the Letter reveals that while this was an important part of the Letter, it was not the only important part. The Letter deals with issues of relevance to the public's evaluation of the Sheriff's Office performance, including allegations by a 27 year employee of a good ole boy atmosphere, as well as a discussion of the importance of, and difficulty in obtaining, diversity in the Sheriff's Office. While the Letter covers a personnel dispute, it also critiques the Sheriff's Office policies and operations, as well as the press coverage of these issues. "When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters *only* of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684 (emphasis added). Accordingly, we conclude that Pool was not speaking merely "as an employee upon matters only of personal interest," but also as a "citizen upon matters of public concern." *Id.*

 The form and context of the speech in the Letter also support an interpretation of the Letter as covering a matter of public concern. The speech in question was contained in a Letter to the Editor and read at a public meeting attended by the press and African American and Latino citizens. The topic of the meeting was the media's treatment of the highly-publicized investigation of Pool, an African American woman of high stature in the Sheriff's Office. During this time period, the media had been closely investigating Pool's conduct and background.[5]

The content, form and context approach has been criticized as leaving too much discretion to the judge's subjective beliefs. *See* Mike Harper, *Connick v. Myers and*

---

**4.** Although *Connick* provides for a limited type of First Amendment protection, *see* 461 U.S. at 154, 103 S.Ct. 1684, it is difficult to apply this nebulous standard.

**5.** While "[m]edia publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern," *Lan-* *caster v. Indep. Sch. Dist. No. 5,* 149 F.3d 1228, 1233 (10th Cir.1998), it is a consideration. Public employees must be able to speak freely on questions of public concern without fear of retaliatory dismissal. *Pickering,* 391 U.S. at 572, 88 S.Ct. 1731.

the First Amendment Rights of Public Employees, 16 Hastings Comm. & Ent. L.J. 525, 526 & n. 4, 532–33 (1994). Looking to the speaker's motivation has been suggested as helpful in determining public concern. *Id.* at 536 & n. 66 (quoting *Connick*, 461 U.S. at 148, 103 S.Ct. 1684); citing *Rankin*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315("In *Rankin*, both the majority and the dissent focused on what McPherson [the public employee] was trying to express: The majority looked to the motive for her speech and the dissent looked to its content. *Id.* at 396–97, 107 S.Ct. 2891 (Scalia, J., dissenting)."). The *Connick* court noted that "the focus of Myers'[the public employee's] questions [a questionnaire regarding a district attorney's office policies] is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre." *Connick*, 461 U.S. at 148, 103 S.Ct. 1684.

Here, the Defendants argue that Pool's conduct should be interpreted as delivering a private grievance in a public forum; in other words, turning her job problems into a cause celebre. However, Pool has demonstrated a career-long commitment to race and gender equality, and her personal job concerns were allegedly intertwined with race and gender equality in public law enforcement. Therefore, on balance, we find that the Letter covered a matter of public concern.

**2. The speech in question was a substantial or motivating factor in the adverse employment action.**

■ The employee must show that the speech in question was a "substantial or motivating factor" in the adverse employment action. *Umbehr*, 518 U.S. at 675, 116

S.Ct. 2342; *Bauer*, 261 F.3d at 784. As the record indicates, the Letter was a substantial or motivating factor contributing to Pool's demotion and pay cut. However, we note that it was the last of many contributing factors (i.e., her admittedly poor judgment in authorizing Brigham's release, her failure to manage the Records Unit which had a backlog of 6,000 warrants not keyed into the computer, her oral commitment of $400,000 not in the budget to a third party contractor and her failure to adequately provide systems for double bunking).

**3. The Defendants' legitimate administrative interests outweighed Pool's First Amendment rights.**

■ The Defendants' legitimate interest in running the Sheriff's Office outweighed Pool's free speech rights. Pool was one of five Commanders in the Sheriff's Office, reportable only to the elected Sheriff himself. She was a high profile employee whose career had been followed in the press. The government's interest in avoiding disruption is magnified when, as here, the employee asserting the right to free speech serves in a "confidential, policymaking, or public contact role." *Moran v. State of Washington*, 147 F.3d 839, 846(9th Cir.1998) (quoting *Rankin*, 483 U.S. at 390–91, 107 S.Ct. 2891). Further, the Letter was publicized while Pool was serving as Acting Sheriff, it was signed "Vera C. Pool, Commander, Multnomah County Sheriff's Office" and it listed the Sheriff's Office address, thereby lending the authority of the Sheriff's Office to Pool's statements.

■ The speech in question should not be considered in a vacuum, but in conjunction with the manner, time and place of the employee's expression and the context in which the dispute arose. *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. We

also consider whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891(citing *Pickering,* 391 U.S. at 570–573, 88 S.Ct. 1731). The reading of the Letter occurred soon after Pool had been reprimanded for her conduct involving the Brigham release, which garnered significant media attention. Although Pool admitted that she should have investigated Brigham's situation further before authorizing the release, she used the meeting as a forum, in part, to defend her actions, as well as to insult her fellow employees at the Sheriff's Office and address her concerns about the good ole boy network fostering race and gender discrimination.

These comments were made about a sheriff's office, where "[d]iscipline and esprit de corps are vital to its functioning." *Cochran v. City of Los Angeles,* 222 F.3d 1195, 1201 (9th Cir.2000). " '[A] wide degree of deference to the employer's judgment is appropriate' when 'close working relationships are essential to fulfilling public responsibilities,' " as in a sheriff's office, a quasi-military organization. *Id.* (quoting *Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684). Although the end of the Letter compliments Sheriff Noelle's stand on diversity issues, the rest of the Letter, with its graphic comparison to a septic tank, undermined Sheriff Noelle's authority and ability to competently run the Sheriff's

Office. Pool was aware of Sheriff Noelle's goals for the Sheriff's Office—improving agency cohesiveness, pursuing an atmosphere of openness and good faith with employees and developing an expectation of leadership by example. Pool acknowledged that one of her duties as a Commander was to act as a liaison between Sheriff Noelle and the African American community and to promote Sheriff Noelle's employment policies positively. Publicly likening the Sheriff's Office to a septic tank with a good ole boy network does not fulfill this mission.

 "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891. Pool's conduct detrimentally affected the functioning of the Sheriff's Office. Numerous Sheriff's Office employees complained to Sheriff Noelle about the article and Pool's statements. Sergeant Bjork, the union president, had "literally hundreds of conversations" with upset corrections and law enforcement employees about the incident. Sheriff Noelle decided to demote Pool and decrease her pay because he had "lost confidence in her judgment and her ability to be an effective Commander." His decision was well within the latitude afforded to public employers to maintain effective management.[6]

### B. Oregon Revised Statutes 659A.030/Retaliation Claim

It is unlawful for an employer "to discharge, expel or otherwise discriminate

---

6. Moreover, Sheriff Noelle had additional motivating reasons for demoting Pool, discussed above. The Supreme Court has stated that once the employee has discharged her burden, the government can escape liability by showing that it would have taken the same action in the absence of the protected conduct. *Umbehr,* 518 U.S. at 675, 116 S.Ct. 2342. However, we need not reach this analysis, as the government has shown that its legitimate administrative interests in running the Sheriff's Office outweighed Pool's First Amendment rights.

against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so." Or.Rev.Stat. § 659A.030(1)(f) (2001). It is also unlawful for an employer to discriminate based on race and sex, among other bases. Or.Rev. Stat. § 659.030(1)(a) and (b). Or.Rev.Stat. § 659A.030 was modeled after Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–3(a), which prohibits similar conduct.

■ To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that: "(1) she was engaging in protected activity, (2) the employer subjected her to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." *Bergene v. Salt River Project Agric. Improvement and Power Dist.*, 272 F.3d 1136, 1141 (9th Cir.2001) (citation omitted); *accord Hardie v. Legacy Health Sys.*, 167 Or.App. 425, 432–33, 6 P.3d 531 (2000). The Oregon Court of Appeals has characterized the causal link as a "substantial factor" determination. *Seitz v. State ex rel. Albina Human Res. Ctr.*, 100 Or.App. 665, 675, 788 P.2d 1004 (1990). Pool's claim fails on the first prong—she was not engaging in protected activity.

■ Pool alleges that this may be a mixed motive case, where the Defendants were motivated by both proper and improper motives. To prevail on a "mixed motive" claim under Oregon law, a plaintiff must be able to "show that he or she would not have been fired but for the unlawful discriminatory motive of the employer." *Hardie*, 167 Or.App. at 435, 6 P.3d 531(quotations and citations omitted). The crux of the standard is "whether, in the absence of the discriminatory motive, the

employee would have been treated differently." *Id.*

The district court pointed out that throughout her employment with the Sheriff's Office, Pool had been vocal about instances of racism and sexism in the workplace. In 1976, she filed a discrimination charge against Multnomah County which resulted in changes in Multnomah County policy toward female employees. However, the district court correctly found that Pool's "complaints" were not sufficient to support her retaliation claim because the 1976 charge was too remote and she was unable to connect her general complaints to any adverse employment decision. The district court also found that Pool's only possible claim—that she was demoted because she complained about discrimination in the Letter—failed because the Letter did not constitute a complaint and publicizing the Letter was not a protected activity under Or.Rev.Stat. § 659A.030.

Pool argues that the district court's definition of a "complaint" is too narrow, contending that Or.Rev.Stat. § 659A.030(1)(f) protects an employee from retaliation not only if the employee files a formal complaint, but also if the employee suffers adverse employment consequences as a result of opposing any practices forbidden by this section. While Pool's statement of the law is correct, so is the district court's finding that the Letter was not a protected activity in the context of Or.Rev.Stat. § 659.030(1)(f). The Letter addressed the Sheriff's Office policies and operations, including allegations of a good ole boy network, the importance of diversity in the Sheriff's Office and Pool's struggles to attain diversity. However, the Letter does not allege that Multnomah County (the only Defendant under the Or.Rev.Stat. § 659.030A claim) unlawfully discriminated against anyone based on race or sex. Although the Letter states that "there appears to be an effort to re-establish the

good ole boy network by ousting those in positions of authority who are not part of that thinking," [7] it also states that "out of the current seven executive command staff positions, four are filled by females. The atmosphere of keeping things the way they were is gradually dissipating—ending a [divisive] organization and creating one that offers a diverse perspective with the inclusion of women, people of color and even those of different sexual orientation." Moreover, although the Letter refers to Pool's past "lack of promotion," at the time she made the statements in question she had attained the high rank of Commander and was serving as Acting Sheriff. Thus, the Letter was not a protected activity in this context.

Pool has not established that she would have been treated differently in the absence of any alleged discriminatory motive. *See Hardie*, 167 Or.App. at 435, 6 P.3d 531. Pool had complained about discriminatory practices in the past, but she worked in the Sheriff's Office for 27 years, and advanced to the rank of Commander. She admits in the Letter that she and Sheriff Noelle shared a vision of diversity for the Sheriff's Office, that she "supports his philosophy" and that Sheriff Noelle "has created a platform of opportunity by bringing about fundamental and necessary changes to the Sheriff's Office." The Letter continues that "it is unfortunate that all personnel within the ranks of the Sheriff's Office do not buy into this philosophy." Sheriff Noelle demoted Pool and decreased her pay, effective November 10, 1997, because he "lost confidence in her judgment and her ability to be an effective Commander." Sheriff Noelle's reasons for demoting Pool are discussed above. We con-

clude that no reasonable jury could find that Multnomah County demoted Pool in retaliation for any opposition to race or gender job discrimination.

## IV. Conclusion

Although we find that the Letter was a matter of public concern and a substantial or motivating factor for Pool's demotion and pay cut, we affirm the district court's finding of summary judgment in favor of the Defendants on Pool's § 1983 claim as the Defendants' legitimate administrative interests outweighed Pool's First Amendment rights. We also affirm the district court's finding of summary judgment in favor of Multnomah County on Pool's Or. Rev.Stat. § 659A.030(1)(f) claim, as publicizing the Letter was not a protected activity under the statute.

AFFIRMED.

---

7. Pool does not specify who she is referring to as being ousted. This statement was made before her demotion and while she was serving as Acting Sheriff at Sheriff Noelle's behest. Although it may be possible to interpret Pool's "ousting" statement as opposing race and sex discrimination, this statement is a negligible part of the Letter. Moreover, Pool has not proven a causal connection between this portion of the Letter and the adverse employment action taken against her.