249 F.3d 1142 (9th Cir. 2001)
 BRAD HUFFORD, PLAINTIFF-APPELLEE,
v.
JAMES MCENANEY; JAY DAVIS; JAMES BOYD, INDIVIDUALLY AND AS COMMISSIONERS OF THE NORTH ADA COUNTY FIRE AND RESCUE DISTRICT; LARRY PERRY; MICHAEL CURRY, OPINION INDIVIDUALLY AND AS FIRE CHIEF AND DEPUTY CHIEF OF THE NORTH ADA COUNTY FIRE AND RESCUE DISTRICT, DEFENDANTS-APPELLANTS.
 No. 99-36041
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 8, 2001
Filed May 22, 2001
 
 [Copyrighted Material Omitted]
 Bobbi K. Dominick and Angela Shaer; Elam & Burke; Boise, Idaho; attorneys for the defendants-appellants.
 John C. Lynn; Lynn, Scott & Hackney; Boise, Idaho; attorney for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Idaho Edward J. Lodge, Chief Judge, Presiding D.C. No. CV-98-00411-EJL
 Before: Harry Pregerson, Sidney R. Thomas and Ronald M. Gould, Circuit Judges.
 
 Thomas, Circuit Judge
 
 1
 Brad Hufford alleges that the defendants violated his clearly established First Amendment rights when they discharged him for reporting that fellow firefighters had downloaded a large cache of hard core pornographic files on the firestation's computers. Defendants appeal from the denial of their summary judgment motion asserting qualified immunity under 42 U.S.C. §§ 1983. We affirm in part and reverse in part.
 
 I.
 
 2
 Hufford began his employment with the North Ada County Fire and Rescue District ("the Department") in January, 1985. In 1992, Hufford was promoted to Shift Captain, where he remained until he was discharged effective May 4, 1998. As Shift Captain, Hufford was outranked only by the fire chief and the deputy fire chief.
 
 
 3
 At all relevant times, the Department's policy prohibited "[d]isplaying visuals of sexual content . . . i.e., nude pictures, videotapes, etc." In December, 1996, when the Department was contemplating the purchase of an Internet connection, Hufford suggested that the Department adopt a policy explicitly prohibiting the use of the connection to view pornographic Web sites. The Department did not adopt a computerspecific policy at that time; however, the Department implemented Hufford's proposed policy after the incident at issue in this lawsuit. Despite the lack of a formal policy, from January until March, 1997, Hufford instructed the firefighters on his shift not to use the computer to view pornography.
 
 
 4
 On April 10, 1997, Fire Chief Perry was at Station No. 2 for a meeting, and noticed Hufford doing something at the computer:
 
 
 5
 And I looked to my left. And Brad [Hufford] was sitting in the library. And Brad was clicking through some files. And I don't recall exact words. But I think I said, "Brad, what have you got there? " And he said, "I think you'd better look at this, Chief." It's my recollection that I went in there. And I sat behind Brad while he was sitting in the chair. And he went through cache files. And his words to me, "I think some of this may be illegal, Chief." And I'm not fully aware of all the laws pertaining to the Internet and all that sort of stuff."
 
 
 6
 What Hufford and Perry saw was shocking: evidence that hundreds of hours of hard core pornographic material had been downloaded on the station's computers. Hufford and Perry examined a random sampling of the files together. According to Perry, some of the files contained pictures of children approximately 7-9 years old. Perry further described the files he viewed:
 
 
 7
 I saw women making love to women. I saw what I presumed to be children. I saw, on one, there was men with men . . . . I do not recall seeing bestiality. I do recall seeing some animals in some of those Web sites. But I do not recall any sexual intercourse with animals or viewing that . . . . There was a nude woman standing next to a horse. I believe there was another one there where a nude girl was in a reclined position with a dog standing over her. But I do not recall sexual intercourse.
 
 
 8
 Hufford and Perry compiled a list of the dates and times each of these files had last been viewed. Later that afternoon, Hufford told several members of his shift that Chief Perry had seen the Internet files, and that he believed the chief would be instigating some sort of investigation. He advised them to remove any sexually explicit materials they might have in their lockers.
 
 
 9
 Perry opted not to conduct any kind of internal investigation. Instead, having no knowledge of computers, and believing himself to be "not that good of a trained investigator," he reported the Internet cache to his "good friend, Ed Parker, Garden City police chief." Administratively, Chief Perry took no active steps to address the pornography problem on a department-wide level. He did respond--on a purely ad hoc basis--to various crew members who came to him:
 
 
 10
 And that's when the word started getting around of what was going on. And some people came to me. Well, in particular, Reggie Edwards, he was worried that we would find out that he had visited a Web site he claims to have seen accidentally . . . . It was having to do with resorts in Mexico, or something like that, and basically a clothing-optional type resort
 
 
 11
 During that period of time that Ed Parker was handling all this, several other people came into my office, talking about this issue. Some of them I gave stern warnings to. Others I didn't believe it was necessary to give them a stern warning . . . . But it became obvious to me that I was just--I needed to just stop, let Ed Parker finish off what was going on, and then take it after Ed Parker got through with it, or let Ed Parker handle the whole thing if . . . there was criminal activity here.
 
 
 12
 Although Perry characterized his discussions as sometimes involving "oral reprimands," he never documented any of the warnings. He did not issue a single written reprimand. In total, Perry claims that he issued only three or four oral warnings.
 
 
 13
 Meanwhile, as the criminal investigation progressed, pressure mounted within the Department:
 
 
 14
 And at some point here in this whole process--I'm not sure if it was after Ed Parker or just before Ed Parker came back with the results--I said to myself, "I'm tearing my fire department apart. I've got to get the message across to these guys that this is not acceptable. And I don't want to tear my fire department apart because"--I don't know. I could have disciplined half of my fire department at that point, maybe given them time off or even fired them for some of those things. But I did know that my fire department was being torn apart. And I wanted to get it put back together.
 
 
 15
 Despite the impact of the scandal on the Department's morale, Perry testified that Hufford acted properly by reporting the pornography cache, because "[t]hat's his duty as shift commander." According to Perry, pornography was a subject of regulation in the Department because "[w]e try to be pillars of the community. And pillars don't do that sort of stuff, you see." Perry further stated that Hufford's proposal for a departmental Internet policy (later adopted) was "very appropriate," because "I don't believe that sort of stuff has any--or should be on anything that the taxpayers purchased."
 
 
 16
 Given the fear that pervaded the Department while the criminal investigation was pending, Chief Perry stated that he was sensitive to the possibility of retaliation against Hufford. In particular, Perry fielded one angry complaint from Captain Bob Stevenson, who told Perry that "Brad is not the choirboy that [Perry] thought him to be and that, basically, that he predicted that, within a year, if [the Chief were to ] find out what's going on around here . . . Brad will not be employed here."
 
 
 17
 According to Perry, Hufford himself brushed off any potential threat of retaliation. Nevertheless, Perry stated that "there was a lot of fear and there was anger because no one knew exactly what was going to happen or what was in the police report there for several days . . . . I let it be known real quick that, if I thought that any retaliatory acts were going to be committed by anyone towards Brad, I would make that person my personal hobby."
 
 
 18
 The police investigation closed without any charges. Despite the depiction of extremely young children in some of the files, all of these had blocks placed over the genital areas, and were therefore deemed not illegal--at least under state law. There were also images without such blocks depicting individuals of questionable age, but in the absence of specific evidence that the individuals in the images were children, the police did not take any action.
 
 
 19
 True to Bob Stevenson's prediction, Hufford's standing within the Department began to fall directly after his exposure of the pornography cache. Within three months of the close of the investigation, Hufford received his first written reprimand ever. That reprimand involved allegedly inappropriate remarks overheard by a female firefighter, "which created for her a hostile work environment." However, no female employee had ever filed any kind of written or oral complaint about Hufford, and the evidence of the alleged incident was obtained from Brian Ashton, one of the firefighters most upset about the pornography incident.
 
 
 20
 On March 16, 1998, Hufford received a second written reprimand for forcing open the office door when the office key was missing in order to retrieve a "call back box " so that he could find a replacement for a firefighter who had called in sick. The Department reported Hufford's actions to the sheriff's office as a criminal break-in. According to Deputy Cobb of the sheriff's office, the Department had explicitly requested that the police arrest Hufford. However, no charges were filed.
 
 
 21
 Hufford's second written reprimand also documented other complaints against him, including his alleged lack of communication with other shifts and an attitude not supportive of management. Hufford requested a more detailed explanation of these other charges. In a letter dated March 27, Deputy Chief Curry charged that Hufford had flipped lighted matches at members of another fire company during joint training, self-dispatched when not needed to the scene of a car accident, allowed and encouraged a crew member to mow patterns onto another fire company's station lawn, and allowed a member of his crew to scribble comments on office walls. The letter also claimed that Hufford had burned plastic or paper materials under the kitchen cabinet a year earlier, resulting in a burn mark on the underside of the cabinet.
 
 
 22
 On March 31, Hufford received the letter detailing the earlier charges against him together with a notice of Suspension With Intent to Discharge. According to that notice, Perry and Curry decided to terminate Hufford because of his inappropriate reaction to the second written reprimand. On March 17, after receiving that reprimand, Hufford had met with the staff at Station 2 to discuss any problems the crew might be having with his leadership. This was interpreted by management as "creating a hostile work environment."
 
 
 23
 At a formal hearing on April 15, 1998, Hufford made a statement in his defense to the Commissioners. In his presentation, Hufford addressed his belief that he was the victim of retaliatory discharge because of his exposure of the pornography cache. He also denied the charge that his March 17 meeting with members of Station 2 was a form of harassment. A fellow firefighter, Richard Brown, made a statement defending Hufford's behavior as a firefighter and a leader. On April 28, 1998, the Commissioners sent Hufford a letter stating that the evidence supported the charges against him and notifying him of his termination.
 
 
 24
 On May 18, 1998, Hufford responded to the Grievance Committee, claiming that his termination was largely in retaliation for his exposure of the Internet pornography cache. The Grievance Committee and the Department met and formulated a settlement that would allow Hufford to return to work. On June 19, 1998, in a lengthy and emotional letter, Hufford declined the offer. In that letter, Hufford noted that "[b]eing one of the people pushing for change has not been without its price. I have, from time to time, been in conflict with members of management and it has been noted that I speak my beliefs with passion." Hufford declined the settlement offer because he felt that the two-rank demotion to Driver was an inappropriate response to his alleged misbehavior. He stated that he would agree to a one-rank demotion to Captain. That offer was not accepted.
 
 
 25
 Hufford subsequently brought this action under 42 U.S.C. §§ 1983 against the Commissioners of the Department (James McEnaney, Jay Davis, James Boyd); Department Chief Larry Perry; Deputy Chief Michael Curry; and Union Local 2311 for its alleged failure to represent him.
 
 
 26
 Hufford claims that by discharging him, the defendants violated his clearly established First Amendment, procedural and substantive due process rights. Before the district court, Hufford also made several pendant state law claims--against the union for breach of its duty of fair representation, against all defendants for negligent and/or intentional infliction of emotional distress and against all defendants for violating the Idaho whistleblower statute. Finally, Hufford alleged retaliation in violation of Title VII and the Idaho Human Rights Act. The district court denied the defendants' motion with respect to all three of Hufford's federal constitutional claims -- the only ones at issue in this appeal.
 
 
 27
 On interlocutory appeal from a denial of summary judgment on a claim of qualified immunity, we have jurisdiction over the purely legal question of whether Hufford has established a claim supported by clearly established law. Moran v. Washington, 147 F.3d 839, 843 (9th Cir. 1998). On de novo review, we must construe the facts in the light most favorable to Hufford, the non-moving party, and decide whether clearly established law gave notice to the Department that its termination of Hufford violated his First Amendment and due process rights. Id. at 844; Fed. R. Civ. Pro. 56.
 
 II.
 
 28
 The district court correctly denied qualified immunity to the defendants because they should have been aware that discharging Hufford in retaliation for his truthful whistleblowing violated his constitutionally protected right to free speech.
 
 
 29
 Public officers acting in their official capacities are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Hufford, as the party seeking to deprive the defendants of qualified immunity, bears the burden of proving that the rights he claims were "clearly established" at the time they were allegedly violated. Moran, 147 F.3d at 844. Furthermore, Hufford must establish a particular, rather than abstract, right. Id. at 845 ("[T]he right referenced by the Harlow test is not a general constitutional guarantee . . . but its application in a particular context.") (internal quotation marks and citation omitted). Notwithstanding this particularity requirement, "[c]losely analogous pre-existing case law is not required to show that a right was clearly established." White v. Lee, 227 F.3d 1214, 1238 (9th Cir. 2000).
 
 
 30
 In order to show that qualified immunity should not apply, Hufford must show that two things were clearly established at the time of his termination: "(1) that [his ] speech involved a matter of public concern and (2) that the interests served by allowing [him] to express [himself] outweighed the state's interest in promoting workplace efficiency and avoiding workplace disruption." Keyser v. Sacramento City Unified Sch. Dist., 238 F.3d 1132, 1136 (9th Cir. 2001) (citing Brewster v. Bd. of Ed., 149 F.3d 971, 978 (9th Cir. 1998)). The latter requirement is often referenced as the Pickering balancing test. Pickering v. Bd. of Ed., 391 U.S. 563, 568 (1968).
 
 
 31
 For the purposes of this appeal, the defendants have stipulated that Hufford's termination was in retaliation for his reporting of use of the government's computers to download pornography, and that his speech was "a matter of public concern" protected by the First Amendment. Thus, in order to show that the defendants are not entitled to qualified immunity, Hufford must establish that the interests served by allowing him to express himself about the downloading of pornographic material on the Department's computers outweighed the Department's interest in promoting workplace efficiency and avoiding workplace disruption.
 
 
 32
 Hufford easily meets this requirement. First, "[d]efendants cannot rely on disruption which they instigated or exacerbated to outweigh [plaintiff's] First Amendment rights." Roth v. Veteran's Admin., 856 F.2d 1401, 1408 (9th Cir. 1988). Hufford only reported the pornography cache to one other individual--Chief Perry. Therefore, any disruption that occurred to those other than Perry could not have been caused by Hufford. In fact, Chief Perry's testimony makes clear that whatever disruption occurred was fueled in large measure by the widespread fear of criminal charges. Chief Perry, and not Hufford, initiated the police involvement.
 
 
 33
 Second, in a whistleblowing context the presence or absence of disruption is not entitled to the same weight as it is in a Pickering analysis where the employee's speech involves mere criticism of the visions or policies of management. This is so because in order to satisfy Pickering, an employer "must do more than show mere disruption; instead it must show actual injury to its legitimate interests." Keyser, 238 F.3d at 1137 (internal quotation marks and citation omitted). Employers cannot be said to have a legitimate interest in silencing reports of corruption or potential illegality. As the Roth court pointed out:
 
 
 34
 An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.
 
 
 35
 Id. at 1407-08 (quotation omitted).
 
 
 36
 As the district court aptly observed in this case, if defendants' argument were accepted, "no publicly-employed supervisor or manager would be able to report misconduct without fearing for the security of their job and the unavailability of remedy."
 
 
 37
 In an attempt to evade the mandate of our whistleblowing case law, the defendants rely on Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir. 1999), in which we summarized the factors that go into a Pickering balance. Defendants contend that several of the factors we articulated in Gilbrook tip in its favor. For example, defendants argue that Hufford's exposure of the pornography cache eroded close relationships premised on personal loyalty and confidentiality and obstructed routine office operations. See Gilbrook, 177 F.3d at 867-68. Defendants further contend that Hufford's highlevel position, as well as the narrow audience to which he directed his statements, militate in defendants' favor. Id. Finally, the defendants claim that Hufford's statements were made with reckless disregard for the truth. Id. at 868.
 
 
 38
 The defendants' reliance on Gilbrook is misplaced. Even assuming arguendo that some of the Gilbrook factors, taken acontextually, would support defendants' position, Gilbrook did not purport to address a whistleblower situation. In Gilbrook, we held that the First Amendment interest of firefighters who publicly criticized their city's fire-preparedness outweighed the department's interest in avoiding workplace disturbance. 177 F.3d at 869-70. The firefighters in Gilbrook were criticizing the policies of management; not, as here, attempting to enforce those policies.
 
 
 39
 Neither the need for close working relationships nor the need for strong loyalty obviates the more pressing need for compliance with laws and prudential company policies. Furthermore, Hufford's speech was hardly made with a reckless disregard for the truth. In fact, quite the opposite is true: The scandal erupted in direct proportion to the unfortunate truth of his statements.
 
 
 40
 Finally, in a good-faith whistleblowing context, the breadth of one's audience is irrelevant. It would be absurd to extend First Amendment protection only to those whistleblowers who immediately appear on the local news. Although we have "acknowledged that a narrow, limited focus and a limited audience weigh against a claim of protected speech, " Brewster, 149 F.3d at 981 (internal quotation marks and citation omitted), a wide audience is not a literal prerequisite to the denial of qualified immunity. Rather, this factor aids courts in assessing the extent to which speech involves a matter of public concern. Id. at n.4 (noting that "the degree to which the speech involves a matter of public concern--the`publicness' of the speech, so to speak--is directly relevant to the Pickering balance"). Hufford's speech clearly lies at the core of First Amendment protection, regardless of audience. Keyser, 238 F.3d at 1137 (reiterating that unethical conduct and violations of regulations are "inherently of interest to the public").
 
 
 41
 In sum, our recent articulation of Pickering factors in Gilbrook does not disturb the unremarkable conclusion that an employer who discharges an employee in retaliation for legitimate whistleblowing does so in violation of the employee's clearly established First Amendment rights. We therefore affirm the district court's denial of summary judgment with respect to this claim.
 
 III.
 
 42
 We lack appellate jurisdiction over the district court's denial of qualified immunity on Hufford's claim that the defendants violated his right to procedural due process because there are genuine issues of material fact that preclude summary judgment on the issue. Johnson v. Jones , 515 U.S. 304, 307 (1995).
 
 
 43
 "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." Brewster, 149 F.3d at 982. Defendants admit that Hufford had a constitutionally protected property interest in his public employment. For the purposes of this appeal, therefore, the only issue is whether Hufford received adequate procedural protection. The determination of the procedure necessary to satisfy due process requirements in a particular context is guided by the three-part balancing test described in Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Mathews requires consideration of:
 
 
 44
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 45
 Id. at 334.
 
 
 46
 When a public employee is terminated for cause, he is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). An employee is only entitled to a "very limited hearing prior to his termination", Gilbert v. Homar, 520 U.S. 924, 929 (1997), which "need not be elaborate." Loudermill, 470 U.S. at 545.
 
 
 47
 In the district court, defendants conceded for the purposes of their motion that the reasons given to Hufford in the predeprivation notice were false and pretextual. On that basis, the district court denied qualified immunity because the defendants had not provided Hufford adequate notice of the true reasons for his termination. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950) ("The notice must be of such a nature as reasonably to convey the required information . . . ." ). However, on appeal, defendants argue that Hufford had "engaged in a variety of acts of misconduct," that he had been informed of the charges and had ample opportunity to address the accusations before his termination. We lack jurisdiction to address those factually-driven questions in an interlocutory appeal.
 
 IV.
 
 48
 Defendants are entitled to qualified immunity with respect to Hufford's claim that they violated his right to substantive due process. If, in a §§ 1983 suit, the plaintiff's claim can be analyzed under an explicit textual source of rights in the Constitution, a court should not resort to the"more subjective standard of substantive due process." Armendariz v. Penman, 75 F.3d 1311, 1319 (9th Cir. 1996) (en banc) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). In this case, because the First Amendment explicitly covers Hufford's claim, the First Amendment, "not the Fourteenth Amendment's guarantee of substantive due process, should guide the analysis of the [plaintiff's] claim[s]." Id. at 1320; see also Albright v. Oliver, 510 U.S. 266, 273 (1994). Thus, we reverse the district court's denial of summary judgment on this issue.
 
 
 49
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.