**Louise CORALES, et al., Plaintiffs,**

v.

**Gene BENNETT, et al., Defendants.**

**No. EDCV 06–00849 SGL (OPx).**

United States District Court,
C.D. California.

May 21, 2007.

R. Samuel Paz, R. Samuel Paz Law Offices, Sonia M. Mercado, Sonia Mercado & Associates, Guy Anthony Leemhuis, Guy A. Leemhuis Law Offices, R. Samuel Paz, R. Samuel Paz Law Offices, Culver City, CA, for Louise Corales, Jamie Soltero, An-

thony J. Soltero The Estate of, Jane Roe 1 a minor, by her Guardian Ad Litem, Mary Roe 1, Jane Roe 2 a minor, by her Guardian Ad Litem, John Roe 1, Guillermo Prieto, Plaintiffs.

Ann D. Wu, Gutierrez Preciado and House, Calvin R. House, Gutierrez Preciado and House, Pasadena, Jacqueline DeWarr, Margaret A. Chidester and Associates, Margaret A. Chidester, Margaret A. Chidester & Associates, Irvine, CA, Nohemi G. Ferguson, Gutierrez Preciado & House, Pasadena, CA, for Gene Bennett, Ontario–Montclair School District The, Kathleen Kinley, Does 1 through 10 inclusive, Defendants.

Daniel T. Hatt, McPeters McAlearney Shimoff & Hatt, Redlands, CA, for University of Redlands, Material Witness.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET # 56)

LARSON, District Judge.

The current action arises out of protests regarding immigration reform legislation, four middle-school students' attempt to participate in these protests, the discipline they received for their actions, and one student's tragic suicide shortly following this discipline.

Currently before the Court is defendants' motion for summary judgment, filed on March 8, 2007, which seeks summary judgment in favor of all defendants as to all claims. The matter was heard on April 23, 2007, at which time the Court took the matter under submission. By Minute Order on May 7, 2007, the Court invited further briefing (which was filed by both sides and reviewed by the Court) and set the matter for hearing again on May 21, 2007, at which time the Court heard further argument. For the reasons and in the manner set forth below, the Court GRANTS defendants' motion.

## I. Objections to Evidence

The Court rules on objections to evidence only to the extent that they address evidence that is material to the Court's present ruling.

Defendants object to plaintiff's expert reports on the basis that they lack adequate factual basis to form an opinion. The expert reports set forth the documents upon which they rely and, based on the Court's review of these reports and the record presented on summary judgment, the documents provide a picture of the events relevant to this action. Defendants have not specified what additional documents or materials should have been reviewed by plaintiffs' experts; instead, they merely state their objection in general terms. The objection on this ground is, therefore, overruled.

Defendants also object to the expert reports on the basis that the experts "lack experience in counseling youth in regards to suicide prevention, detection or treatment." However, defendants fail to articulate why such specific experience is necessary for Dr. Tolbin to give an opinion regarding school administrative practices. Moreover, although defendants make this same objection to the report of Dr. Rath, who gives an opinion regarding the cause of Anthony's suicide, defendants still fail to articulate why, in light of Dr. Rath's considerable credentials, his opinion should be disregarded because he, personally, has never counseled youth regarding "suicide prevention, detection, or treatment." The objection on this ground is similarly overruled.

The Court's ruling on these reports are for purposes of summary judgment only.

## II. Uncontroverted Facts

On Tuesday, March 28, 2006, Anthony Soltero ("Anthony"), Annette Prieto (aka "Jane Roe 2", hereinafter "Annette"), and

one or two other DeAnza Middle School students, left school after their first period class without the prior permission of or supervision of school authorities or their parents.

The only accounts of the students' activities that day come from Annette, one of the students who participated in the walkout. Annette's handwritten account, written two weeks after Anthony's suicide, reveals that the students intended to protest immigration reform legislation, and that she and other students walked to Ontario High School to meet with other students, but found the school was on lockdown. Defs.' Ex. 3. They waited there and talked for a while. *Id.* Annette's deposition fills in more details:

A: Then some people from Ontario [High School] did come, but ... we marched with them, like for a little bit, but it wasn't as much people as it was supposed to be. So after we walked with them for a little bit, we went home.

Q: How many kids from Ontario High came out? Do you know?

A: 10, 15.

Q: How far did you walk with them?

A: We walked to Oaks Middle School.

Q: How long did it take you to get there?

A: Like another hour, an hour and a half.

Prieto Depo. at 28.

Two days later, on Thursday, March 30, 2006, Assistant Principal Gene Bennett ("defendant Bennett") called four students, including Anthony and Annette, into his office after he learned of their absence from another student. The accounts of what happened vary, but all accounts agree that the reason for the students' absence was not discussed, that the students received a lecture from defendant Bennett regarding unexcused absences, and that they received the punishment of being precluded from attending an end-of-the-year school trip to an amusement park or dance. *Compare* Bennett Decl. ¶ 11 ("As was my usual practice, I sternly lectured the students as to the dangers of leaving school without permission, the serious safety concerns created by that choice, and I also informed them of the potential consequences had they been caught off-campus by local police or school administrators, including the possibility of being cited, their parents having to pay a fine, as well as being brought to the police station and having parents called by police.") *with* Prieto Depo. at 39 ("Me, Juan, Lauren and Anthony walked in, and he pointed at the three of us and said, 'You guys are all dumb, dumb, and dumber.' He said, 'You guys are going to have to pay $250 fine;' that he is going to have to get the cops involved, and we're going to have to go to Juvenile hall for, like, certain amount of years; and that we're stupid for doing it, and why did we think that we weren't going to get caught."); *see also* Prieto Decl. ¶¶ 4–8.

After meeting with defendant Bennett, the students attended their classes for the remainder of the school day. Anthony went home and telephoned his mother to tell her he had gotten into trouble, that defendant Bennett was the one who had caught him, and that he was losing an end-of-the-year privilege. When Anthony's mother arrived home, she found that Anthony had attempted suicide by shooting himself in the head with a rifle. Anthony was pronounced brain dead the same day; he was kept on life-support equipment until donation of his organs could be arranged on April 1, 2006. Anthony left behind a suicide note that expressed regret to and his love for his family and friends, that apologized to his father for "making [him] mad," that stated that he killed himself "because [he] ha[d] to[o] many problems," and that expressed con-

tempt for defendant Bennett. (*See* Defs.' Ex. 13: "Tell Mr. Ben[n]et[t] he is a moth-erf# @(=)ker.")

De Anza's principal, Dr. Kathleen Kinley ("defendant Kinley"), was not aware that defendant Bennett had disciplined Anthony and the other students until the afternoon of March 30, 2006. Her last day was March 31, 2006; she had planned to retire on that day.

### III. Plaintiffs' Claims

Plaintiffs assert a number of federal civil rights claims. As their first cause of action, they assert, pursuant to 42 U.S.C. § 1983, claims against individual defendants Bennett and Kinley, in their individual capacities, based on alleged violations of First Amendment free speech rights, substantive due process rights, and rights guaranteed by the Equal Protection Clause. Also as part of their first cause of action, plaintiffs assert a claim pursuant to 42 U.S.C. § 1985(3), alleging that defendants engaged in a conspiracy to violate their rights to equal protection. As their second cause of action, plaintiffs assert a *Monell* claim against the school district.[1] As their third cause of action, plaintiffs assert a failure-to-train and failure-to-supervise § 1983 claim against defendant Kinley in her individual capacity.

As their fourth cause of action, plaintiffs assert state civil rights claims, based on Cal. Civ.Code §§ 51.7 and 52.1.

Finally, as their fifth and sixth causes of action, plaintiffs assert state tort claims for intentional infliction of emotional distress and negligence.

### IV. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *See Harper v. Wallingford*, 877 F.2d 728, 732 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *See Anderson*, 477 U.S. at 261, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

### V. Federal Civil Rights Claims

Plaintiffs assert a number of federal civil rights claims, including § 1983 claims

---

1. *Monell* claims, as they have come to be called, are familiar to the parties and to the Court. These claims, authorized by the United States Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), require that a plaintiff show a constitutional violation occurred as a result of an official governmental policy, custom, or practice.

based on First Amendment free speech rights, the Due Process Clause, and the Equal Protection Clause. Plaintiffs also assert a § 1983 failure to train/supervise claim and a § 1985(3) conspiracy claim.

### A. *First Amendment Claim*

Before determining whether plaintiffs have raised a triable issue of fact as to whether their free speech rights were violated, the Court must determine the parameters of those rights in the context of this case.

It has long been established, and rightly so, that public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (upholding students' right to wear black armbands in protest against the Vietnam War). Indeed, although this oft-quoted language appears first in a case from the Supreme Court that is itself nearing its fortieth anniversary, that case establishes that the proposition it expresses had "been the unmistakable holding of [the] Court for almost 50 years." *Id.* The importance of the free speech rights of students should not be underestimated; the guarantee of free expression of ideas contributes in no small measure to the very foundation of our Republic. To deny school children such rights would palpably chip away at that foundation by teaching them to doubt our professed appreciation for the value of freedom of expression and, of even greater concern, by rendering them unaccustomed to expressing independent thoughts. *See Tinker*, 393 U.S. at 511, 89 S.Ct. 733 (noting that the Court, in 1923, recognized "this Nation's repudiation of the principle that a State might so conduct its schools as to 'foster a homogeneous people.'") (quoting *Meyer v. Nebraska* 262 U.S. 390, 402, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). Perhaps this thought is no more eloquently expressed than it was in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), where the Court, discussing a board of education's duties regarding students' free speech rights to decline to recite the Pledge of Allegiance, stated:

> That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*Id.* quoted in *Tinker*, 393 U.S. at 507, 89 S.Ct. 733.

■ Nevertheless, as important as those rights are, they must be balanced with the countervailing interest of effective public school administration. The Supreme Court has recognized that the First Amendment rights of public school students "are not automatically coextensive with the rights of adults in other settings" and that they must be "applied in light of the special characteristics of the school environment." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *Tinker*, 393 U.S. at 506, 89 S.Ct. 733. "[T]he daily administration of public education is committed to school officials." *LaVine v. Blaine School Dist.*, 257 F.3d 981, 988 (9th Cir.2001) (citation and internal quotation marks omitted), *cert. denied*, 536 U.S. 959, 122 S.Ct. 2663, 153 L.Ed.2d 837 (2002). That responsibility carries with it the inherent authority to prescribe and control conduct in the schools. *Id.* (citation and internal quotation marks omitted). However, "deference does not mean abdication[,]" and 'there are situations where school officials overstep their bounds and violate the Constitution.'" *LaVine*, 257 F.3d at 988.

To determine whether a constitutional violation has occurred, the Court must

first look to the type of speech at issue. The Ninth Circuit, with reference to Supreme Court precedent, has identified "three distinct areas of student speech" that are subjected to different legal analyses. *Chandler v. McMinnville School District,* 978 F.2d 524, 529 (9th Cir.1992). Specifically, those categories are "(1) vulgar, lewd, obscene, and plainly offensive speech, (2) school-sponsored speech, and (3) speech that falls into neither of these categories." The parties agree that the speech at issue here falls into the third category, which is governed by the analysis set forth in *Tinker. See id.*

At the outset, a discussion regarding the actual speech at issue is in order. Although the students' walkout was ostensibly to protest immigration reform legislation, there is no evidence that the students gave speeches, that they discussed matters of immigration reform, or that they carried placards or signs that conveyed their messages. Rather, the evidence reveals that the students left their school to engage in a protest march, met up with like-minded individuals from a local high school, and walked together to a third school. In the absence of evidence of any identifiable speech, these activities, if they are to be protected by the First Amendment, must fall within the definition of "expressive conduct." [2]

■ The United States Supreme Court has given First Amendment protection to conduct that is not speech but which is nevertheless expressive in nature. *See e.g., Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing of black armband to protest Vietnam War); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (flag-burning). However, First Amendment protection does not apply to all cases in which someone *intends* to convey a message by his or her conduct; rather, First Amendment protection applies only when "it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Nunez v. Davis,* 169 F.3d 1222, 1226 (9th Cir.1999), *cert. denied,* 528 U.S. 1115, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000).

■ The facts of *Nunez* are instructive. In *Nunez,* a court administrator was instructed to sign up for training seminars only those employees who had worked on a judge's reelection campaign. She nevertheless signed up two employees who had not. She intended this act to convey the message that the clerks' benefits should not be conditioned upon their working on the judge's campaign; her act was perceived as conveying that message. Based on these facts, the Ninth Circuit concluded that the administrator's speech "possessed 'sufficient communicative elements to bring the First Amendment into play.' " *Nunez,* 169 F.3d at 1226 (quoting *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)).

Here, the record is clear as to the students' intent. *See* Defs.'s Ex. 3 ("Everyone was saying that they were going to all walkout for the Mexican immigrants and they were gonna do it after second period.") The record is less clear as to whether the walkout was likely to be perceived

---

2. The exact content of the speech at issue in this case has proven to be more amorphous than concrete. *Cf. Frederick v. Morse,* 439 F.3d 1114 (9th Cir.2006) (involving banner reading "Bong Hits 4 Jesus"), *cert. granted,* —— U.S. ——, 127 S.Ct. 722, 166 L.Ed.2d 559 (2006); *LaVine,* 257 F.3d at 981(involving poem about school shooting). Plaintiffs explain in their supplemental briefing that "[i]t is the action of political expression to attend a march and protest the immigration legislation that is the protected conduct alleged and proven in this case." Plaintiff's Supp. Brief at 6–7. Plaintiffs' description still fails to identify any speech that falls into any category other than, arguably, "expressive conduct."

as such. *Compare* Bennett Decl. ¶¶ 9–10 (disclaiming any knowledge as to the reason for the students' actions) *with* Bennett's Incident Report (attached as Ex. A to plaintiffs' Further Opposition, filed on April 24, 2007) ("I called in four students who had left school without permission on Tuesday the 28th.... Since all the walkouts were taking place around the area, I told them that they could be cited by the police or picked up and taken home and cited.") *and* Kinley Depo. at 19–20 (discussing an email sent three or four days before the walkout to a number of individuals, including defendant Bennett, that advised them of the possibility of off-campus demonstrations and Kinley's discussion with Bennett regarding this email). A reasonable jury could conclude that the warnings to the school administrators of a possible walkout by students to protest immigration reform by Congress made it very likely that an actual walkout of four students three to four days after the email would be perceived by school administrators as a protest. This is especially so in light of Bennett's acknowledgment that he knew the walkouts were taking place in the area. A reasonable jury, when presented with this evidence, could conclude that the students were engaging in expressive conduct. Having found a triable issue of fact with respect to the nature of the speech at issue, the Court next considers whether it is protected.

The Court's analysis is guided on this point by the recent school student free speech case of *LaVine v. Blaine School District,* 257 F.3d 981 (9th Cir.2001), *cert. denied,* 536 U.S. 959, 122 S.Ct. 2663, 153 L.Ed.2d 837 (2002). The plaintiff in *LaVine* was a high school student who, in the fall of 1998 when high school shootings were current topics in the news, wrote a disturbing poem regarding a school massacre. *Id.* at 983–84. The poem, which he entitled "Last Words," was written in the first person from the perspective of a shooter who murdered 28 classmates before killing himself. *Id.* He gave the poem to his English teacher, not in response to a class assignment, but merely to elicit her comments. *Id.* at 984. She was understandably concerned that the poem was meant to express that the student was having some difficulties.[3] *Id.* Confronted with the content of the poem, and in light of the student's previously expressed suicidal thoughts, record of school discipline, and recent troubles at home, school officials expelled the student, allowing him to return after missing seventeen school days when the student's psychiatrist expressed the opinion that the student could return to school. *Id.* at 984–87.

In analyzing whether the school district violated the student's First Amendment rights by expelling him, the Ninth Circuit applied the *Tinker* analysis, noting the balance that must be struck between the free speech rights of students and effective school administration. *Id.* at 988. Under this analysis, "school officials must justify their decision by showing 'facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'" *Id.* at 989 (quoting *Tinker,* 393 U.S. at 511, 89 S.Ct. 733). The Ninth Circuit emphasized that school officials are not required to wait until actual disruption occurs; rather, because "they have a duty to prevent the occurrence of disturbances,"

---

**3.** Indeed, the Ninth Circuit acknowledged that a school official reading the poem could not help but be concerned about its contents and its author. *See LaVine,* 257 F.3d at 990 ("'Last Words' is filled with imagery of violent death and suicide. At its extreme it can be interpreted as a portent of future violence, of the shooting of James' fellow students. Even in its most mild interpretation, the poem appears to be a 'cry for help' from a troubled teenager contemplating suicide.")

and "[f]orecasting disruption is unmistakably difficult to do," courts inquire whether there are "facts which might reasonably lead school officials to forecast substantial disruption." *Id.* (internal quotation marks and citation omitted). Looking at "the totality of the relevant facts," the Ninth Circuit concluded that the students' First Amendment rights were not violated by his expulsion. *Id.*

Specifically, the Ninth Circuit considered the content of the poem, the student's previous suicidal ideations, the student's home difficulties, and the student's recent breakup with his girlfriend when it concluded:

> Taken together and given the backdrop of actual school shootings, we hold that these circumstances were sufficient to have led school authorities reasonably to forecast substantial disruption of or material interference with school activities—specifically, that James was intending to inflict injury upon himself or others.

*Id.* 989–90.

A similar concern is implicated in the present case. Although there is absolutely no evidence of any threats of violence made by any of the students involved in the walkout, the Court is deeply concerned with the ability of school officials to protect the students involved in such unauthorized walkouts from the dangers encountered by children and young adolescents who roam the streets unaided by adult supervision. *LaVine* makes clear that school officials may take action to protect the safety of individual students even if such action interferes with the student's ability to express him or herself. Here, the students who walked out had no adult supervision—in fact, there is no evidence that any adult was even aware of their absence until well after their return—and the students faced potential dangers from a multitude of sources.[4] School officials are entitled—indeed, they are obligated—to take appropriate action to ensure the safety of their students, including warning them (however sternly) regarding the students' legal obligation to stay in school during school hours.

This responsibility borne by the school officials is heightened, not lessened, in light of the surrounding circumstances here, namely, the very widespread student walkouts to protest immigration reform legislation that have been acknowledged by both sides. Discipline meted out to prevent such widespread walkouts—and the resulting disruption—are justified even when weighed against the students' First Amendment rights as actions taken in light of "'facts which might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities.'" *LaVine*, 257 F.3d at 989 (quoting *Tinker*, 393 U.S. at 511, 89 S.Ct. 733). *Tinker* well recognizes that a child does not shed his or her constitutional rights upon ***entering*** the schoolhouse gate, and students justly deserve broad protection of their speech and expressive conduct that does not disrupt school activities while under school supervision. However, a desire to exercise such rights does not give a child license to ***exit*** the schoolhouse gate with neither permission nor supervision of school personnel, parents, or guardians. To afford protection to such conduct, even when motivated by a noble desire to join in a political demonstration, would render school officials incapable of ensuring the physical safety and well-being of children in their care. Such a compro-

---

4. Although not by any means an exhaustive list, those dangers include child predators, gangs, drugs, alcohol, and traffic accidents.

mise not even the First Amendment commands.

Accordingly, under *Tinker* and in accordance with *LaVine*, the Court must conclude that the plaintiffs have failed to establish a triable issue of fact as to their First Amendment claim.

■ Plaintiffs further argue that their claim should be analyzed as a First Amendment retaliation claim. The Ninth Circuit has recently set forth the standard for evaluating students' First Amendment retaliation claims:

> To establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct.

*Pinard v. Clatskanie School Dist. 6J*, 467 F.3d 755, 770 (9th Cir.2006) (citations omitted). If a plaintiff establishes these elements, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* (internal quotation marks and citation omitted). This part of the test shifts the burden to the defendants to show they would have taken the same action even absent the protected speech. *Id.* Here, however, plaintiffs have failed to establish the first element of engaging in protected activity, and therefore would not be able to succeed on a First Amendment retaliation claim.

For these reasons, the Court concludes that the plaintiffs have failed to raise a triable issue of fact as to their First Amendment claim.

### B. *Substantive Due Process*

Plaintiffs advance three legal theories in support of their substantive due process claim. None of these theories save the substantive due process claim from summary judgment.

### 1. *Substantive Due Process—First Amendment Rights*

■ The concept of substantive due process forbids the government from depriving a person of life, liberty or property in such a way that "shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Nunez*, 147 F.3d at 871. Plaintiffs style their substantive due process claim as one based on the First Amendment. *See* Opposition at 13 ("Substantive Due Process Violation: Retaliation 1st Amendment"). However, such a claim is duplicative of their First Amendment claim and it is not actionable under the rubric of "substantive due process." When a plaintiff's claim is supported by, and can be analyzed under, "an explicit textual source of rights in the Constitution," a court may not analyze that claim under the "more subjective standard of substantive due process." *Hufford v. McEnaney*, 249 F.3d 1142, 1151 (9th Cir. 2001) (internal quotation marks and citations omitted) (declining to consider a plaintiff's substantive due process claim where the rights violated were protected under the First Amendment).

### 2. *Conscience–Shocking Actions*

■ To the extent plaintiffs argue that the defendants' actions were conscience shocking, the uncontroverted facts do not reveal any governmental action that is shocking to the conscience. Accepting the version of events most favorable to plaintiffs, defendant Bennett's actions in lecturing the students may have been more forceful and harsh than called for under the circumstances, but there is nothing shocking to the conscience about a school administrator sternly lecturing children

and adolescents regarding the dangers and consequences of leaving school without the knowledge or permission of their parents or school administrators.

### 3. *Substantive Due Process—Family Relations*

The Ninth Circuit recognizes a due process liberty interest in the companionship between parents and their children. *See Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir.1987), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). To be actionable under this theory, claims must be based on underlying wrongful governmental conduct that amounts to a constitutional deprivation. *See id.* at 1420–21 ("[T]he state has no legitimate interest in interfering with this liberty interest through the use of excessive force by police officers. Such an action constitutes the very sort of affirmative abuse of government power which the substantive protections of the due process clause are designed to prevent. Therefore, the same allegation of excessive force giving rise to Mr. Smith's substantive due process claim based on his loss of life also gives the children a substantive due process claim based on their loss of his companionship."). In the absence of an underlying constitutional violation, plaintiffs' family relations claim fails.

Accordingly, the summary judgment motion is therefore GRANTED as to all aspects of plaintiffs' due process claim.

### C. *Equal Protection*

Plaintiffs contend they were denied equal protection of the laws on the basis of their ethnicity and based on the exercise of their fundamental rights.

█ The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Plaintiffs argue that they were treated differently because of their Mexican ethnicity; however, there is no evidence of record that suggests the students were disciplined on this basis, and defendants are therefore entitled to summary judgment on this claim to the extent it is based on alleged disparate treatment based on their ethnicity.

Plaintiffs also argue that they were disciplined based on their decision to exercise a fundamental right, namely, their free speech rights. However, as set forth above, the Court has ruled that plaintiffs' First Amendment rights were not violated. Therefore, plaintiffs cannot prevail on this claim.

Accordingly, the summary judgment motion is **GRANTED** as to all aspects of plaintiffs' Equal Protection claim.

### D. *§ 1985(3) Claim*

In relevant part, 42 U.S.C. § 1985(3) provides:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*Id.*

Here, there is no evidence of any such conspiracy. It is uncontroverted that defendant Kinley did not know about defendant Bennett's disciplining of the students until after it occurred. There is a com-

plete absence of evidence regarding any other interaction between defendants Kinley and Bennett regarding the events relevant to plaintiff's claims.

Accordingly, summary judgment is **GRANTED** as to this claim.

### E. *Failure to Train/Supervise*

■ Where individual liability is to be imposed upon a supervisor for the actions of a subordinate, a plaintiff must establish the supervisor's "participation in the deprivation of constitutional rights." *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991). This requirement is satisfied where a plaintiff shows that the supervisor set in motion acts which cause others to inflict constitutional injury. *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978). For the court to hold defendant Kinley liable in her individual capacity, plaintiffs must demonstrate: (1) that Kinley's "own culpable action or inaction in the training, supervision, or control of his subordinates" caused the constitutional injury; (2) that Kinley "acquiesce[d] in the constitutional deprivations of which [the] complaint is made[;]" or (3) that her conduct showed a "reckless or callous indifference to the rights of others." *See Larez,* 946 F.2d at 646 (internal citations omitted).

Here, plaintiffs have failed to establish a triable issue of fact as to any of their constitutional claims. Accordingly, summary judgment is GRANTED as to this claim.

### F. *Monell Claim*

Plaintiffs have withdrawn their *Monell* claim.

### VI. State–Law Civil Rights Claims

### A. *Cal. Civ.Code §§ 51.7*

■ Plaintiffs have asserted a claim pursuant to Cal. Civ.Code § 51.7(a). In relevant part, that provision reads:

(a) All persons within the jurisdiction of this state *have the right to be free from any violence, or intimidation by threat of violence,* committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51 [sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation], ... or because another person perceives them to have one or more of those characteristics.

*Id.* (emphasis added). Here, there is no evidence of violence or intimidation by threat of violence. Nor is there any indication that the students were treated differently on the basis of a protected status, such as ancestry or national origin. Accordingly, summary judgment is **GRANTED** as to this claim.

### B. *Cal. Civ.Code § 52.1*

■ Plaintiffs have asserted a claim pursuant to Cal. Civ.Code § 52.1(a). In relevant part, that provision reads.

If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, *with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state,* the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured.

*Id.* Section 52.1(b) authorizes a civil cause of action by persons whose rights have

been interfered with by other persons. Cal. Civ.Code § 52.1(b).

Section 52.1 clearly provides a remedy for conduct that is unlawful by some other measure, such as state law or the United States Constitution. As set forth herein, the remainder of plaintiffs' claims asserted in this action fail, and for that reason, so too does their § 52.1 claim. Accordingly, summary judgment is **GRANTED** as to this claim.

## VII. State Tort Claims

### A. *Intentional Infliction of Emotional Distress*

■■■■ Defendants move for summary judgment regarding plaintiffs' claim for intentional infliction of emotional distress.

The elements of a prima facie case of intentional infliction of emotional distress in California are (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.... In order to be considered outrageous, the conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.

*Tekle ex rel. Tekle v. United States,* 457 F.3d 1088, 1103 (9th Cir.2006) (internal quotation marks and citations omitted). Here, the uncontroverted evidence establishes that the first element is not met. For the same reason that defendants' actions, even accepting a version of events most favorable to plaintiffs, are not "conscience-shocking," they likewise are not outrageous. As stated previously, accepting the version of events most favorable to plaintiffs, defendant Bennett's actions in lecturing the students may have been more forceful and harsh than called for under the circumstances, but those actions

fall far short of the type of outrageous conduct necessary to support a claim for intentional infliction of emotional distress. Accordingly, the Court **GRANTS** defendants' summary judgment motion as to the claim for intentional infliction of emotional distress.

### B. *Negligence*

■■■ To prevail on a claim of negligence, a plaintiff must show that defendants had a duty, that they breached that duty, and that breach was the proximate cause of a resulting injury. Defendants argue that Anthony's suicide was an intervening cause that broke the chain of causation, negating the element of proximate cause.

Proximate cause is legal cause, as distinguished from the laymen's notion of actual cause, and is always, in the first instance, a question of law.... Proximate cause is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury [or damage complained of] and without which such result would not have occurred.

*Walt Rankin & Associates, Inc. v. City of Murrieta,* 84 Cal.App.4th 605, 626, 101 Cal.Rptr.2d 48 (2000). Generally, an act is an intervening cause where it is unforeseeable or extraordinary. *See Maupin v. Widling,* 192 Cal.App.3d 568, 571, 237 Cal. Rptr. 521 (1987). No evidence has been presented from which it could be inferred that Anthony's suicidal act was foreseeable.

Plaintiffs rely on *Tate v. Canonica,* 180 Cal.App.2d 898, 909, 5 Cal.Rptr. 28 (1960), which held that, where a defendant intends to cause injury, and the person whom he intended to injure commits suicide, he is liable where his actions are the actual cause of the suicide:

Consequently, we believe that, in a case where the defendant intended, by his conduct, to cause serious mental distress or serious physical suffering, and does so, and such mental distress is shown by the evidence to be "a substantial factor in bringing about" (Rest., Torts, §§ 279, 280) the suicide, a cause of action for wrongful death results, whether the suicide was committed in a state of insanity, or in response to an irresistible impulse, or not. This rule would not apply where the act of the defendant was intentionally done, but there was no intent to cause injury. It is applicable only where the actor intended to cause injury, and the injury is a substantial factor in bringing about the suicide, *i.e.*, is really a cause, in fact, of the suicide. This does not mean that, in every case where the actor intentionally causes serious mental distress or physical suffering, and this is followed by suicide, the actor is necessarily liable for the suicide. The mental distress or physical suffering may not be, in the particular case, as a matter of fact, a substantial factor in bringing about the suicide. But all recorded history testifies that there are cases in which serious mental or physical suffering is in fact a cause of suicide.

*Id.*

There is uncontroverted expert evidence that states that Anthony's suicide was caused by Bennett's actions. Moreover, Anthony's suicide note could be read to imply that Bennett's actions caused or contributed to Anthony's suicide. However, other than the fact of the lecture itself, there is no evidence that Bennett intended to cause "serious mental distress." Standing alone, a harsh lecture by a school administrator to students regarding the seriousness of leaving school grounds during a school day is not the type of evidence that establishes the category of serious mental distress discussed in *Tate.*

The *Tate* case also addresses negligent acts that are actual causes of suicide, setting up a distinction between situations in which the decedent can control the impulse to commit suicide, and when he cannot control that impulse:

[W]here the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. Some cases speak of "insanity," and of "delirium or frenzy," and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause. We think, in the light of modern knowledge as to mental illness, that this view is too narrow. It should not make any difference that the decedent "knew what he was doing." If defendant is to avoid liability, the decedent's act must be voluntary ... in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself.

*Id.*

Plaintiffs contend that Anthony's impulse to commit suicide was not controllable. Although their expert report opines on the cause of Anthony's suicide, attributing it, through the process of elimination, to defendant Bennett's actions, the report does not give an opinion regarding whether Anthony had an uncontrollable impulse to commit suicide.

Because Anthony's action in committing suicide was unforeseeable and extraordinary, plaintiffs have failed to raise a triable issue of fact as to the element of proximate

cause. Plaintiffs' arguments based on *Tate* do not convince the Court that a contrary result is warranted. Accordingly, the Court **GRANTS** defendants' motion as to the negligence claim.

### VIII. Immunity Issues

#### A. *Qualified Immunity*

■ Defendants argue they are entitled to qualified immunity as to plaintiffs' claims. "A court required to rule upon the qualified immunity issue must consider . . . this threshold question: taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the Initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If a plaintiff, in opposing summary judgment, has raised no triable issue of fact as to whether the officers have violated his constitutional rights, then no further inquiry is needed; however, if plaintiff has raised a triable issue of fact, the Court must determine whether the right at issue was clearly established. *Id.* "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad, general position . . . ." *Id.*

Here, the Court has concluded that plaintiffs have failed to establish a triable issue of fact as to any constitutional violation, so it need not inquire further. However, were the Court required to make such an inquiry, the Court would find that any First Amendment rights that plaintiffs may have had are not clearly established. *LaVine* establishes that school officials may consider the safety of their students as a countervailing interest to those same students' free speech rights. Therefore, even if the Court were to find that plaintiffs raised a triable issue of fact as to a violation of their First Amendment rights, the Court would nevertheless conclude that the individual defendants are entitled to qualified immunity.

#### B. *Eleventh Amendment Immunity*

■ School districts in California are immune from § 1983 claims by virtue of Eleventh Amendment immunity. *Belanger v. Madera Unified School District*, 963 F.2d 248 (9th Cir.1992), *cert. denied*, 507 U.S. 919, 113 S.Ct. 1280, 122 L.Ed.2d 674 (1993). The same is true of the state-law civil rights claims. *Stanley v. Trustees of California State University*, 433 F.3d 1129, 1134 (9th Cir.2006). Eleventh Amendment immunity therefore provides an independent legal basis upon which to grant summary judgment in favor of the district as to plaintiffs' federal and state civil rights claims.

#### C. *Discretionary Act Immunity*

■ Defendants contend that their acts were discretionary and therefore protected by statutory immunity for public employees and entities. *See* Cal. Gov't Code § 820.2. However, that statute protects basic policy decisions, not operational or ministerial decisions, even though they may involve some discretion and choices between alternatives. *See Martinez v. City of Los Angeles*, 141 F.3d 1373 (9th Cir.1998). Discretionary act immunity does not protect defendants in this action.

### IX. Conclusion

At set forth above, the Court **GRANTS** defendants' motion for summary judgment (docket # 56). Summary judgment in favor of defendants is granted as to all claims.

The Court will enter defendants' previously lodged proposed judgment, and the Clerk shall close the case.

IT IS SO ORDERED.